RICHARD A. SKRIPAK AND RENEE K. SKRIPAK, ET AL.,[1] PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos.  745–79,  5914–79,  11391–79,  Filed February 26, 1985.
15040–79, 15667–79, 16214–79,
16215–79, 17479–79,  6101–80,
6178–80,  8009–80.

---

[1] The cases of the following petitioners have been consolidated: Richard A. Skripak and Renee K. Skripak, docket No. 745–79; William Frank McCall, Jr., docket No. 5914–79; Edgar A. Neely, Jr., and Ruth N. Neely, docket No. 11391–79; Estate of Archer B. Glenn, Jr., Deceased, Wachovia Bank & Trust Co., N.A., Executor, docket No. 15040–79; Thomas S. Wallace and Martha Wallace, docket No. 15667–79; J.W. Lynn, Jr., and Nancy C. Lynn, docket No. 16214–79; Matt B. Russ and Frances R. Russ, docket No. 16215–79; H.C. McDermid and Mary Jo McDermid, docket No. 17479–79; Lovic A. Brooks, Jr., and Carrie Brooks, docket No. 6101–80; W. Henry Maddox and Helen G. Maddox, docket No. 6178–80; and C.H. Smith, docket No. 8009–80.

*Charles E. Elrod, Jr., David G. Phillips*, and *Stephen D. Fromang*, for the petitioners in docket No. 745–79.

*Edgar A. Neely, Jr.*, pro se and for the co-petitioner in docket No. 11391–79.

*Charles E. Elrod, Jr.*, and *David G. Phillips*, for the petitioners in docket Nos. 5914–79, 15040–79, 15667–79, 16214–79, 16215–79, 17479–79, 6101–80, 6178–80, and 8009–80.

*Stuart B. Kalb* and *Lourdes DeSantis*, for the respondent.

PARKER, *Judge*: Respondent has determined the following deficiencies in these petitioners' Federal income taxes:

| Taxpayer(s) | Docket No. | Year(s) | Deficiency |
|---|---|---|---|
| Richard A. Skripak and Renee K. Skripak | 745–79 | 1975 | $4,480.30 (increased to $6,820 by amendment to answer) |
| William Frank McCall, Jr. | 5914–79 | 1975 | 4,857.00 (increased to $9,846 by amendment to answer) |
| Edgar A. Neely, Jr., and Ruth N. Neely | 11391–79 | 1975 1976 | 14,560.54 16,675.36 |
| Estate of Archer B. Glenn, Jr. | 15040–79 | 1975 | 42,040.37 |
| Thomas S. Wallace and Martha Wallace | 15667–79 | 1975 | 16,208.10 |
| J.W. Lynn, Jr., and Nancy C. Lynn | 16214–79 | 1976 | 7,911.00 |
| Matt B. Russ and Frances R. Russ | 16215–79 | 1975 | 4,963.93 |
| H.C. McDermid and Mary Jo McDermid | 17479–79 | 1975 1976 1977 | 11,498.00 14,785.00 3,130.00 |
| Lovic A. Brooks, Jr., and Carrie Brooks | 6101–80 | 1975 1976 | 15,074.00 7,290.00 |
| W. Henry Maddox and Helen G. Maddox | 6178–80 | 1975 1976 | 12,371.65 12,764.74 |
| C.H. Smith | 8009–80 | 1975 1976 | 23,509.50 23,140.00 |

These consolidated cases involve taxpayers who participated in a charitable contributions tax shelter program through which they purportedly purchased scholarly reprint books, held them for slightly more than 6 months, and then contributed them to various small rural public libraries. These taxpayers deducted charitable contributions in amounts of approximately 3 times what they purportedly paid for the books. The issues for decision are whether these taxpayers are entitled to deductions for charitable contributions under section 170,[2] and, if so, the amounts of the allowable deductions.[3]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The several stipulations of fact and exhibits attached thereto are incorporated herein by this reference.

Petitioner William Frank McCall, Jr. (McCall), docket No. 5914–79, resided in Moultrie, Georgia, at the time he filed his petition in this case. Petitioners Edgar A. Neely, Jr. (Neely), and Ruth N. Neely (collectively the Neelys, docket No. 11391–79), J.W. Lynn, Jr. (Lynn), and Nancy C. Lynn (collectively the Lynns, docket No. 16214–79), and W. Henry Maddox (Maddox) and Helen G. Maddox (collectively the Maddoxes, docket No. 6178–80) all resided in Atlanta, Georgia, at the time they filed their respective petitions in these cases. Petitioners H.C. McDermid (McDermid) and Mary Jo McDermid (collectively the McDermids, docket No. 17479–79) resided in Fort Pierce, Florida, at the time they filed their petition in this case. The Neelys, Lynns, McDermids, and Maddoxes filed their respective joint Federal income tax returns for their years involved, and McCall filed his 1975 individual Federal income tax return, with the Internal Revenue Service Center at Chamblee, Georgia. All of these petitioners used the cash receipts and disbursements method of accounting. When they

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all references to Rules are to the Tax Court Rules of Practice and Procedure.

[3]The statutory notices in docket Nos. 745–79, 15667–79, 16214–79, 6178–80, and 8009–80 made various adjustments other than the adjustment with respect to charitable contributions. However, petitioners did not challenge these other adjustments in their respective petitions. Accordingly, these other adjustments are deemed to have been conceded. Rule 34(b)(4).

filed their respective petitions, the other petitioners had their residences at the following locations:

| Petitioners | Docket No. | Residence |
| --- | --- | --- |
| Richard A. Skripak and Renee K. Skripak | 745–79 | Fort Pierce, FL |
| Estate of Archer B. Glenn, Jr., Deceased, Wachovia Bank & Trust Co., N.A., Executor[4] | 15040–79 | Winston-Salem, NC |
| Thomas S. Wallace and Martha Wallace | 15667–79 | Charlotte, NC |
| Matt B. Russ and Frances R. Russ | 16215–79 | Mendham, NJ |
| Lovic A. Brooks, Jr., and Carrie Brooks | 6101–80 | Atlanta, GA |
| C.H. Smith | 8009–80 | Oliver Springs, TN |

The cases of McCall, the Lynns, the McDermids, and the Maddoxes have been selected by the parties and tried as the lead cases in these consolidated cases, with the remaining petitioners agreeing to be bound by our determinations in the lead cases.[5] Unless otherwise indicated, the term "petitioners" shall hereinafter refer collectively to McCall, Neely, Lynn, McDermid, and Maddox.

## Background of Reprint Publishing and BFL's Sale to Embassy

During the 1960's, the Federal Government began providing large amounts of funds to finance expanding library construction and book acquisitions at American colleges and universities. This created a demand for library books; this demand and a source of funds helped to create a new industry of book publishers, called "reprint publishers." Modern printing technology permitted these publishers to print economically

---

[4]Archer B. Glenn, Jr. (Glenn), docket No. 15040–79, died on Aug. 27, 1978. Respondent's statutory notice dated July 30, 1979, was addressed and sent to the Wachovia Bank & Trust Co. (Wachovia), in Winston-Salem, North Carolina, as the executor of Glenn's estate. Wachovia alleged its capacity as the executor, and its situs in North Carolina, but in his answer, respondent denied that portion of the allegation. However, respondent's answer admitted the authenticity of the statutory notice mailed to Wachovia as the executor of the estate. Since then, respondent has not disputed either Wachovia's representative capacity or its North Carolina situs, and accordingly, we consider these facts to be undisputed.

[5]The Neelys (docket No. 11391–79) declined to agree to be bound, so the Court, exercising its discretion, consolidated their case with the four lead cases for purposes of trial, briefing, and opinion.

smaller quantities of books (50 to 150 copies) than book publishers had previously been able to print. These reprint publishers generally selected standard academic works that new and expanding college and university libraries would need to acquire. Generally, the reprint publishers selected titles that were "out of print," meaning that they were no longer available from the original publishers, and older titles that were in the public domain and no longer protected by copyrights. This use of public domain materials meant that the reprint publishers did not have to pay author royalties, and obviated the need to obtain licenses or assignments of existing copyrights. These reprint publishers would do just that—reprint by photo offset or other new techniques titles previously printed by other publishers. These reprint publishers would then sell their reprint books (reprints) to various libraries, primarily college and university libraries, and large public library systems in populous urban areas. During the peak of the library reprint publishing industry, there were more than 300 reprint publishers.

Beginning about 1970, Federal funds were drastically cut, sharply reducing the demand for the academic or scholarly works printed and sold by reprint publishers. Many reprint publishers had not anticipated this cutoff of Federal funds and had printed many more books than the diminished market demanded. Federal funding for academic libraries remained low throughout the 1970's. As a consequence, many reprint publishers went out of business and many others merged with or were acquired by other publishers. By 1981, there remained only a few reprint publishers printing and selling these academic or "scholarly" reprints.

Books For Libraries or BFL Communications, Inc. (BFL), was a book publisher and book manufacturer. BFL published both reprint books and original works (trade publications or trade books). Approximately 70 percent of the reprint titles BFL published were in the public domain, and the remaining 30 percent were published under license by copyright holders on a royalty basis. BFL divided its reprint titles into eight major series, each listed in a separate catalog—(1) Essays, (2) Poetry (Granger Poetry Index), (3) Short Stories, (4) "Selected Bibliographies," (5) American Fiction, (6) Biographies, (7) "Black Heritage Library Collection," and (8) Plays. BFL

normally limited its sales efforts to public libraries located in major metropolitan areas and to college and university libraries. Approximately 70 percent of BFL's customers were colleges, universities, and other institutional libraries. The remaining 30 percent of BFL's customers were book wholesalers or jobbers, most of whom resold the BFL books to the same kinds of institutional libraries. BFL had approximately 7,000 separate reprint titles, and its average reprint inventory during the early 1970's was approximately 1.5 million volumes.

During the early 1970's, BFL leased warehouse space in Hialeah, Florida, where it stored its reprint inventory. The Hialeah warehouse was owned by Ben Fellner (Fellner), who also was a principal owner (if not the sole owner) of Embassy Book Services, Inc. (Embassy). Embassy, formed in 1971 or 1972, had succeeded BFL on a Government contract to supply books to U.S. Information Agency (USIA) libraries overseas.

BFL was affected by the unexpected reduction in Federal library funding for college and university libraries and for public libraries, and, by 1973 BFL was undergoing serious financial difficulties. BFL's inventory of reprint volumes was larger than BFL needed for its regular operations. BFL was under heavy pressure from its creditors to pay some of its debts and decided to sell some of its excess inventory to generate cash from the sale and to write down its inventory and obtain a refund of taxes.

On November 15, 1973, BFL sold 499,351 reprint volumes (sometimes rounded up to 500,000 for convenience) to Embassy for $24,967.55, or 5 cents a book. This agreement between BFL and Embassy prohibited Embassy from selling the reprint books in the United States for 5 years. Embassy did not physically remove the approximately 500,000 books from Fellner's warehouse where they had been stored prior to the sale, but instead merely segregated its books in the warehouse from those belonging to BFL. After its sale to Embassy, BFL still retained over 1 million volumes of books in its inventory, including at least 100 copies of each of the 7,000 reprint titles in its catalogs. Because Embassy's contacts were overseas, and because of the contractual prohibition of domestic sales, BFL's sale to Embassy had no effect on BFL's domestic market for its reprint books.

## *Joiner and RPI's Book Contribution Program*

Thomas E. Joiner (Joiner) is a Georgia attorney. In August and September of 1973, Joiner represented Behavioral Systems, a subsidiary of BFL's corporate parent, Thrift Credit Corp. (Thrift), regarding a possible merger between BFL and Behavioral Systems. Joiner met Harvey Roth, BFL's president, and learned about BFL's financial distress. During the course of this investigation, Joiner learned of the existence of BFL's excess inventory (before the Embassy sale). Joiner was not involved in BFL's November 1973 sale of 500,000 books to Embassy.

Sometime early in 1974, Joiner began investigating a "book contribution plan," under which wealthy or high tax bracket individuals would purchase some of BFL's excess inventory, contribute the books to charitable institutions, and claim tax deductions for those contributions. Joiner contacted a number of libraries in Georgia to ascertain "demand" for free BFL books. After independent research and consultation with an accounting firm, Joiner concluded that taxpayers who purchased and contributed BFL books would be entitled to charitable contribution deductions at BFL's catalog retail list price. Joiner recognized that because the books to be involved in the program were excess inventory, there was a risk of price deterioration and reductions of allowable charitable deductions if BFL's retail list prices decreased during the necessary 6-month holding period. However, Joiner was assured by BFL that it did not intend to sell its books for less than its retail list price. Accordingly, Joiner informed Thrift's president, Burton L. Koffman, that a workable program could be developed. Koffman agreed to let Joiner go ahead with the program and to contact various BFL personnel to work out the details.

In discussing his book contribution plan with Roth, Joiner learned of BFL's November 1973 sale of 500,000 books to Embassy. At some point, Joiner and the BFL representatives agreed that Joiner would acquire some of the books BFL had sold to Embassy. The record does not indicate why BFL chose to have Joiner purchase books from Embassy rather than purchase other books from BFL's own inventory. In any event, Joiner continued to deal primarily with Roth, in part because Roth was acquainted with Fellner, Embassy's principal owner,

but mainly because of the restriction against domestic sale in Embassy's contract with BFL. Joiner viewed it as essential that the books be conveyed free of restrictions, believing that any restriction on disposition could affect the fair market value of the books in the hands of the "contributors." More importantly, BFL's participation was essential for Joiner to acquire the books in the first place—the contract between BFL and Embassy specifically precluded Embassy from selling the books "to any person, firm, corporation or other entity which may resell (or sell to a person who may resell) the Books in the United States."

On June 17, 1974, BFL, Embassy, and Joiner[6] entered into a series of agreements under which—

(1) Joiner obtained an option to purchase from Embassy reprint books with an aggregate retail list price in BFL's catalog of $1.8 million, approximately 150,000 books. The reprint books to which this option pertained were a portion of the 500,000 books BFL had sold to Embassy in 1973. Joiner was entitled to choose from at least 1,000 different titles of which Embassy had at least 20 copies. Joiner was to pay Embassy 25 cents per book for $300,000 worth of books (as determined under BFL's catalog retail list price), approximately the first 25,000 books, and 35 cents per book thereafter. The books to be made available to Joiner were expressly limited to reprint books that BFL was currently selling to college, university, public, and other institutional libraries. This original option as amended extended only for 1 year, but a series of subsequent amendments extended the option until June 30, 1976.

(2) Embassy was obligated to continue to store the books at the Hialeah warehouse until Joiner exercised his purchase option. Embassy agreed to pack and ship the books according to Joiner's instructions when and as Joiner exercised the option. Embassy also agreed, if Joiner so requested, to obtain for Joiner's account insurance on the reprint books subject to Joiner's option in amounts not less than the purchase prices

[6]Although the various transactions involved both Joiner and Francis A. Tarkenton, his business partner, Tarkenton assigned all of his interest to Joiner. Indeed, Tarkenton's assignment was dated June 14, 1974, 3 days *before* the tripartite transaction. In any event, Tarkenton was not involved in the subsequent promotion of the book contribution program. Consequently, we shall treat the June 17, 1974, transactions as between Joiner alone and BFL/Embassy.

(25 cents and 35 cents). Joiner was to reimburse Embassy for the insurance costs when and as he paid Embassy the purchase price, i.e., when and as he exercised his option. Although Embassy was formally obligated to bear all expenses for storage, packing, and shipment of the books, BFL agreed to reimburse Embassy for Embassy's out-of-pocket expenses such as shipping and packing costs.

(3) Joiner was obligated to pay BFL a commission in exchange for BFL's execution of and delivery to Embassy of waivers of the restriction against domestic sales (contained in the original agreement between Embassy and BFL). This commission was 16.67 percent of BFL's catalog retail list price as of the time of sale for the first $300,000 (as determined under BFL's catalog retail list price) worth of Embassy books, and 18.17 percent of BFL's catalog retail list price for the remaining books, *less* the amounts Joiner paid to Embassy (the 25 cents and 35 cents per book). BFL's waiver obligation came into effect only with regard to each specific exercise by Joiner of his option to purchase books from Embassy, and only after Joiner had paid BFL the commission it was due. Joiner also agreed to pay directly to Embassy 20 cents per book out of the commission due BFL as a deposit to cover the shipping and handling expenses for which Embassy was entitled to reimbursement from BFL. Embassy was to return to BFL the reimbursement deposits paid by Joiner on behalf of BFL in excess of Embassy's actual, reimbursable expenses. Since BFL's reimbursements to Embassy of its shipping and handling expenses were paid out of Joiner's commission to BFL, Joiner effectively bore the costs of shipping and handling. Consequently, Joiner's total cost for the reprint books was 16.67 and 18.17 percent per book of BFL's catalog retail list price.

Also on June 17, 1974, Joiner assigned his interest in these contracts to Reprints, Inc. (RPI), a Georgia corporation formed shortly before these transactions. Joiner was RPI's president and sole shareholder.

RPI put together a "Book Purchase Participation Program" (book contribution program) by which it identified libraries to receive books and contributors who would purportedly purchase the books from RPI and contribute them to the libraries. Although Neely participated in RPI's 1974 book contribution

program, none of the deficiencies determined against the Neelys or against the other taxpayers in these consolidated cases involved RPI's 1974 program. Aside from the number and identities of the participants and certain mechanical aspects of matching participants and libraries, RPI's 1974 program was essentially the same as its 1975 and 1976 contribution programs. We shall not make separate findings regarding RPI's 1974 program.

RPI's first step was to put together a list of BFL reprint titles that would be made available to participating libraries. Accordingly, BFL's president selected[7] various titles from BFL's catalogs, titles of which Embassy had adequate quantities (at least 20 copies), to be offered to libraries.

Next, Joiner, on behalf of RPI, sent out form letters to various small institutional and rural public libraries informing them of the program. These letters stated that books were to be given to libraries by various "interested donors," books that "nonurban libraries, * * * due to budgetary limitations, may not be able to provide." A library's obligation under the plan was "to accept the donation, to acknowledge receipt of the donation when delivered and to certify that the books are accepted for use in the Libraries." The books were to be delivered to the libraries at no cost (e.g., no shipping charges), but the participating libraries were required "to bear whatever expense would be involved in processing the books for use in the Libraries" once the books were received by the libraries. Each solicitation included lists of the BFL reprint titles available to the libraries that chose to participate in RPI's book contribution program. These lists were separated into series of books corresponding with BFL's various series as of the time of BFL's 1973 sale to Embassy. RPI used the BFL series titles—(1) Granger (Poetry), (2) Essay, (3) Short Stories, (4) Selected Bibliographies, and (5) Black Heritage. It is not clear whether BFL's other three series—American Fiction, Biographies, and Plays—were offered under RPI's program.

---

[7] Joiner testified that Roth selected the titles, but Roth denied that he did so. Since RPI was concerned that the titles to be offered were still being offered and sold by BFL (in order to document RPI's position on fair market value), and since Roth was more familiar than either Fellner or Joiner with the BFL titles owned by Embassy and with the titles still being sold by BFL, it appears more likely that Roth selected the titles, and we so find as a fact.

For the years 1975 and 1976, the RPI book contribution programs included approximately 3,023 different reprint titles. RPI offered approximately 2,678 separate BFL reprint titles in its 1975 program (part I and part II). RPI offered approximately 1,240 BFL reprint titles in its 1976 program, of which approximately 895 had also been offered under the 1975 program and 345 were new titles for that year. The libraries were asked to select from these lists the titles and the number of copies of each they wished to receive. At some point in this preliminary step, RPI asked each participating library to certify its status as a tax-exempt institution entitled to receive deductible charitable contributions.

RPI's solicitations were primarily, if not exclusively, to small rural public libraries in the southeastern United States. Such libraries normally purchased few, if any, reprint books from BFL, and such reprint books as they purchased normally involved geneology or local history subjects of a type not included in the RPI book contribution program. Consequently, RPI's book contribution program had virtually no effect upon BFL's market. Although Roth and BFL knew of RPI's book contribution plan when BFL agreed to its portion of the June 17, 1974, transactions, there was no express agreement or understanding that Joiner (through RPI) would not solicit libraries in BFL's market. In fact, a few of the books channeled through RPI's program ended up with some of BFL's primary customers such as the University of South Carolina. However, Joiner largely limited his solicitations for RPI to the small, rural libraries, and the vast majority of RPI's books ended up in the hands of these libraries.

Not surprisingly, many libraries chose to participate in RPI's book contribution program by filling out the lists of selected titles and certifying their tax exemptions. Generally, libraries, particularly small rural public libraries of the type solicited by RPI, have difficulty rejecting any gifts of books because of the bad public relations problems that would develop with their patrons and governing public bodies if it became known that they rejected free books. In 1975 and 1976, RPI used a computer to keep track of most of the participating libraries' selections.[8]

---

[8]In 1974, this had been done manually. RPI's computer list for its 1975 program inexplicably omitted approximately 100 titles, most of which were multiple volume sets. However, the parties

RPI's next step was to locate "donors" to "purchase" the books to be contributed to the participating libraries. In 1975 and 1976, RPI prepared and circulated offering memoranda, describing the program as follows:

Under this Program, a Purchaser will buy Units of Books. It is anticipated that he will hold the Books for more than six months and then make a gift of them to a qualified organization, such that the fair market value of the Books at the time of gift will be deductible for federal income tax purposes. * * * It is anticipated that such fair market value will far exceed the purchaser's cost in the Books so that the Purchaser will receive a net tax benefit from the Program.

\*    \*    \*    \*    \*    \*    \*

[RPI] intends to purchase volumes under the Embassy Option and then resell them under the Program at ⅓ of the BFL catalogue list price. Under the Program, separate lots of books will be sold outright to purchasers so that purchasers will acquire unrestricted ownership of particular books allocated to them. The books will be at the complete will and disposition of the Purchaser, who may have them delivered to his home or to any place specified by him.

Under the program, a purchaser would have no out-of-pocket expenses for storage, insurance, shipping, and the like—(1) there were no storage charges for the books at the warehouse in Hialeah, Florida; (2) RPI would obtain and deliver to the purchaser insurance binders showing full coverage in the purchaser's name in the amount of the purchaser's cost of his books; and (3) Embassy was to bear the cost of shipping the books to the contemplated donees, or to wherever the purchaser designated the books to be sent.

With regard to eventual disposition of the books, the offering memoranda stated—

a Purchaser is free to dispose of books purchased by him at any time, in any manner and to any person or entity selected by him. However, the Program is predicated on the theory that Purchasers will use the books for the support of institutions in need by donating them to Qualified Organizations, as defined herein. To aid Purchasers in the disposition of the books, [RPI] will compile a list of Qualified Organizations which express a willingness and desire to have books of a certain type donated to them. Upon authorization of a Purchaser pursuant to the Request for Instructions mentioned above, [RPI] will arrange for and execute donations on behalf of

and the Court have included these titles in their count of the number of titles involved in the book contribution program.

such Purchaser. A portion of the proceeds from the Program received by [RPI] will be used for this administrative function.

Although hedged, the memoranda contemplated that the participants would claim charitable contributions valuing their contributed books at BFL's catalog retail list price, 3 times what the taxpayer-purchasers would pay to RPI. RPI's book contribution program was aimed at high-bracket taxpayers who could best benefit from charitable contributions deductions.

The offering memoranda warned that the purchase of the units of books involved a high degree of risk. Among the reasons stated in the memoranda for this high risk were—(1) the recent incorporation and minimal assets of both RPI and Embassy; (2) BFL's continuing financial decline and uncertain market; (3) the improbability of profitable resale of the books by the RPI purchasers because they had no experience in the market; (4) the possible challenge of the tax treatment by IRS; (5) the absence of commitments from libraries for all books available under program, with the risk that RPI might not be able to arrange contributions for everyone desiring to have RPI do so; (6) possible error by RPI in determining tax-exempt status of certain donees; and (7) possible change in Federal tax laws.

Although Joiner and RPI's counsel did not believe that its book contribution subscription agreement constituted securities within the meaning of Federal and State securities laws, nonetheless, RPI's program was offered and sold under the "private offering" exception from registration available under Federal securities law. For this reason, RPI used formal offering memoranda and used terms such as "units of participation" and the like. For the same reason, RPI's offering memoranda required each potential purchaser to complete a "preliminary questionnaire" to confirm the participant's financial status and awareness of the nature and risks of RPI's book contribution program. Likewise, each participant was required to execute a subscription agreement—(1) acknowledging receipt of the offering memorandum and agreeing that his purchase was to be governed by the terms of the memorandum; (2) confirming his execution of the preliminary questionnaire, affirming the truth of statements therein, and authorizing reliance thereupon by RPI; (3) acknowledging that the

opportunity was offered to him to examine fully all aspects of the offering and to ask and have answered by RPI personnel questions regarding the program; (4) representing his financial savvy or reliance upon advice sufficient to evaluate the merits and risks of the program, and representing his ability to bear the economic risks of the program; and (5) acknowledging that the memorandum was the sole means of offer and that no general public solicitation occurred.

The 1975 memorandum offered 200-book units at $2,500 per unit. The minimum purchase was four units, although the memorandum allowed a purchaser to buy one-half immediately (part I of the 1975 program) and to contract to buy the remaining one-half at a later date (part II of the 1975 program). For part I, the memorandum called for consummation of the purchase on or about June 25, 1975, so that the 6-month holding period could be met for 1975. For part II, the purchase was to be consummated on or about February 1, 1976.

The 1976 memorandum offered 64-book units at $2,500 per unit. The minimum purchase was two units. The memorandum called for consummation of the purchase by June 30, 1976, so that the 6-month holding period could be met for 1976.

RPI's book contribution program was successfully marketed. Approximately 40 individuals subscribed, many of whom purchased participation units in more than 1 year. When an individual subscribed to the 1975 or 1976 program (either through a firm oral commitment or submission of the written subscription form), the subscription information (name and amount of subscription) would be keypunched and entered into the computer. In most cases, the computer would allocate to each participant a list or lists of books that RPI had previously allocated to a particular library pursuant to its selection list. Towards the end of the 1976 program, when RPI was running out of libraries, certain books were allocated to participants that had not yet been allocated to or selected by libraries. RPI subsequently located libraries that would accept the books previously allocated to these purchasers. With one exception, these were the only occasions where the participating libraries were not given the opportunity to select the books they wished to receive but instead were merely presented a list of books to accept or reject.

The computer was programmed to match a sufficient number of library selections with a purchaser so that the BFL catalog list prices of the selections totaled approximately 3 times the amount of the purchaser's subscription. In other words, each $2,500 participation unit was thus allocated books with list prices in BFL's retail catalog aggregating approximately $7,500. At this point, the computer printed out separately numbered lists showing each set of books allocated to one purchaser and one library.

Next, RPI prepared a document entitled "Warehouse Receipt" for each numbered computer book list, stating as follows:

### WAREHOUSE RECEIPT

Embassy Book Service, Inc.              Consecutive No. L- _____
5301 N.W. 161 Street
Hialeah Lake, FL 33014                  Date of Issue: June _____, 1975

THIS IS TO CERTIFY that Embassy Book Service, Inc. ("Embassy") received in the warehouse situated at 5301 N.W. 161 Street, Hialeah Lake, Florida 33014 for the account of [RPI] ("Depositor") in apparent good order, except as noted hereon (contents, condition and quality unknown) the order of books containing _____ volumes packaged in boxes bearing the designation L- _____ and being those books specified on the schedule designated as LIST NB. L- _____ which is annexed to Bill of Sale No. RL _____ of even date herewith by and between Embassy Book Service, Inc. and [RPI] and Bill of Sale No. PL _____ of even date herewith by and between [RPI] and _____, which schedule is incorporated by reference as a part of this receipt, subject to all the terms and conditions contained in the existing contractual agreements between Embassy Book Service, Inc. and [RPI] with regard to said books, such property to be delivered to Depositor's order, upon the surrender of this Warehouse Receipt properly endorsed.

EMBASSY BOOK SERVICE, INC.

By: _____
                President

FIRST ENDORSEMENT

All right, title and interest in this receipt and the goods covered hereby is hereby endorsed and assigned to _____ to whom the goods covered hereby have been sold.

[RPI]

By: _____
President

Dated: June _____, 1975

SECOND ENDORSEMENT

The books described in the above Warehouse Receipt are hereby released from this receipt for delivery from Warehouse.

This _____ day of _____, 197 _____.

_____
Assignee of Depositor

RPI exercised its purchase option and received bills of sale from Embassy containing the same computer book lists. Fellner signed each "Warehouse Receipt" on behalf of Embassy.

RPI prepared a document entitled "Bill of Sale" for each matched "Warehouse Receipt" and numbered book list, stating as follows:

Consecutive No. PL _____

BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS that [RPI], in consideration of ten dollars ($10) and other good and valuable consideration paid to it by _____ ("Purchaser"), the receipt whereof is hereby acknowledged, does hereby sell, assign and deliver to the said Purchaser the goods, chattels and personal property enumerated and described in the schedule hereto annexed and designated as LIST NB. L- _____. To hold the same to the said Purchaser for his own use and benefit. Title to said goods, chattels and personal property passes from Seller to the Purchaser at the time the Bill of Sale is placed in the U.S. Mail addressed to Purchaser.

Joiner, on behalf of RPI, signed each "Bill of Sale" and the assignment space on each "Warehouse Receipt," and filled in the appropriate spaces with the list number or numbers, the participant's name, and the date. The respective computer list

numbers, warehouse receipt numbers, and bill of sale numbers all matched.

In addition to each "Bill of Sale" and "Warehouse Receipt," RPI sent to each participant a letter stating in part:

### ACCEPTANCE OF SUBSCRIPTION

This is to inform you that your subscription for the Book Purchase Participation Program of [RPI] has been accepted. Enclosed herewith are Bill of Sale No. PL _____ which transfer title to the books listed on the attached schedules to you. There will be forwarded to you under separate cover and without a cover letter a Warehouse Receipt. YOU MUST RETAIN THE ORIGINAL OF THIS WAREHOUSE RECEIPT AND RETURN, PROPERLY ENDORSED, IN ORDER TO OBTAIN A RELEASE OF YOUR BOOKS FROM THE WAREHOUSE.

On each letter, the blank space was filled in with the appropriate "Bill of Sale" numbers.

At the same time these documents were prepared and sent, the books allocated to each participant were segregated by their respective computer book lists and set aside for each participant at Fellner's warehouse in Hialeah, Florida.

In November of 1975, RPI, through Joiner, contacted the book contribution program participants, sending each participant a letter entitled "Consummation of Donation," a form entitled "Request for Instructions," and a document or documents entitled "Special Power of Attorney." The "Consummation of Donation" letter stated that the time had arrived to arrange to close out the book program on December 29, 1975. The letter asked each participant to complete the "Request for Instructions" form so that RPI would know what each participant wanted done with the books allocated to him. The letter directed the participants to sign the second endorsement on their respective warehouse receipts, post-dating their assignments to December 29, 1975.[9] If the participant wanted RPI to arrange the "donation" of the participant's books, he was instructed to sign and to check the appropriate box on the

---

[9] Indeed, the letters directed certain participants to "correct" certain dating errors, stating—

"Some of you have already returned the Warehouse Receipts with the date left blank. The date December 29, 1975 will be inserted on these Warehouse Receipts. Others of you have returned the Warehouse Receipts with dates other than December 29, 1975 inserted. Those Warehouse Receipts are returned herewith with the dates changed to December 29, 1975. Those of you who receive such Warehouse Receipts with this communication should initial each Warehouse Receipt above both the number "29" and the month "December" at the places where the changes are made."

"Request for Instructions" form and to complete the "Special Power of Attorney" form or forms. These "Special Power of Attorney" documents stated that the participant authorized Joiner, as the participant's "Attorney in Fact," to donate the participant's allocated books to a designated library. There was a separate "Special Power of Attorney" form for each participating library and participating "donor," each form separately identifying the RPI computer book list number used in the "Bill of Sale" and "Warehouse Receipt" documents. Each library designated on each "Special Power of Attorney" form was the library to which the RPI computer had allocated the titles on the computer book list at the time the participant had subscribed to the program.

If a participant did not want RPI to arrange to donate the books allocated to him, he was instructed to execute and postdate the second assignment on the "Warehouse Receipt" document, to sign and to check the appropriate box on the "Request for Instructions" form, and to indicate on the "Request for Instructions" form where he wanted the books to be shipped. A few RPI participants specifically designated the institutions that would receive the books allocated to those participants. Most participants, however, chose to have RPI arrange the donations, executing the appropriate "Special Power of Attorney" forms.

After confirming what the participants wanted done with the books allocated to them, RPI again contacted the libraries that had chosen to participate in RPI's book program by selecting titles they wanted to receive. Most of these libraries still wanted the books. In the few instances where the libraries decided not to accept books, RPI located other libraries that were interested in and willing to accept the books. These libraries were not given the opportunity to select the titles they wanted to receive but instead were offered those books previously allocated to another library (and specifically allocated to a particular participant) to accept or reject.

RPI instructed each library still wishing to receive books to execute a form or forms entitled "Special Power of Attorney." Each form stated that the library designated Joiner as the library's "Attorney in Fact," empowered on its behalf to accept and execute acceptance forms for the books to be transferred

to the library. Each recipient library executed these "Special Power of Attorney" forms.

Next, Joiner executed a dual document for each participant and designated library. The top half of each such document, captioned "Declaration of Gift," stated that Joiner on behalf of the participant was giving books, identified by reference to an attached list (the RPI computer book list), to the designated library. The bottom half of the document, captioned "Acceptance of Gift," stated that Joiner, on behalf of the designated library, accepted the gift of books. Both halves of the documents were dated December 29, 1975.

Joiner directed Embassy to ship each participant's allocated books to the designated library·or libraries. Subsequently, the libraries executed forms prepared by RPI acknowledging their receipt of the books. Generally, these "Acknowledgement of Receipt" forms were dated in February of 1976. RPI then prepared and sent to its participants documents entitled "STATEMENT OF INFORMATION REQUIRED BY SECTION 1.170–1(a)(3)(ii)"[10] (section 170 statements), which provided as follows:

The information set forth below relates to the deduction in the amount of _____ under the contribution section of Taxpayer's Itemized Deductions.

(a) The name and address of the organization(s) as to which the contribution was made is:

(b) The date of the actual contribution was: _____

(c) The property contributed was new library books which were in excellent physical condition at the time of the contribution.

(d) The property was acquired by purchase and the date of acquisition was _____

(e) The fair market value of the property at the time the contribution was made was the amount of _____ and the method utilized in determining the fair market value was the published catalogue price for sales to libraries by the publisher of the books.

(f) The cost of said property was _____ or approximately 150 percent of manufacturing cost and taxpayer has taken no deductions relating to said property under the provisions of Section 1016 of the Internal Revenue Code.

(g) No deduction was taken into account by reason of Section 170(e) of the Internal Revenue Code because no deduction is required.

(h) Taxpayer entered into no agreement or understanding relating to the use, sale, or disposition of the property contributed except that the contribution was made on the good faith representation that the donee accepted the gift with the intent to use the books in the library of donee.

---

[10]The appropriate reference is actually sec. 1.170A–1(a)(2)(ii), Income Tax Regs.

(i) 100 percent of the amount stated in subparagraph (e) was claimed as a deduction for the taxable year ____ and the entire interest in the property was contributed during the taxable year of ____. No deductions have been claimed in any prior year or years as to interest in the property contributed.

RPI supplied the pertinent information in these blank spaces for the taxpayers.

Both Part II of RPI's 1975 program (the "purchases" postponed to February 1, 1976) and its 1976 program used the same series of transactions and forms, including computer matching of "donor" participants with "donee" libraries, "Warehouse Receipts," "Bills of Sale," and "Special Powers of Attorney" to Joiner for both "donor" and "donee." The goal of each series of transactions and forms was to give each participant legal ownership and control of certain books for slightly over 6 months, and to arrange donations of those books to "qualified" (e.g., tax-exempt) libraries and institutions so that each participant would be deemed the "donor" to the recipient libraries of those books.

None of the RPI participants ever sold his allocated books on the open market, nor did any participant elect to keep his allocated books for his own use. All of the RPI participants "chose" to "contribute" their allocated books to various public libraries as contemplated under RPI's book contribution program.

The offering memoranda indicated that after payment of its acquisition costs and other costs and expenses in the program, RPI would net about 20 percent of the total amounts of the participants' subscriptions as its profit from the programs. This would be about $2,000 of each $10,000 subscription price, but the record does not indicate the actual profit realized by RPI on the book contribution program.

### Petitioners' Participation in RPI's Book Contribution Program

Each of the petitioners (McCall, Neely, Lynn, McDermid, and Maddox) purchased units of participation in RPI's book contribution program. Each petitioner was approximately in the 50-percent marginal rate tax bracket at the time. Lynn subscribed to RPI's 1976 program, while the others subscribed to both part I and part II of RPI's 1975 program.

Each of the petitioners received an offering memorandum and completed a preliminary questionnaire and subscription agreement. Each of the petitioners received from RPI "Acceptance of Subscription," "Bill of Sale," and "Warehouse Receipt" documents referring to specific RPI numbered computer book lists.[11] None of the "Bill of Sale" documents sent to McDermid were signed on behalf of RPI. The remaining documents, including all of the "Warehouse Receipt" documents, were signed by Joiner on RPI's behalf. Each of these computer book lists represented books already allocated to a specific library that had chosen to participate, the allocation based on the specific titles each library had asked to receive.

The four petitioners who participated in RPI's 1975 program (McCall, Neely, McDermid, and Maddox) were collectively allocated a copy or copies of 2,645 of the 2,678 BFL reprint titles available in the RPI program, or 98.8 percent. Of those 2,645 titles so allocated, 264 (10 percent) were allocated to only one of the four petitioners, 1,126 titles (42.6 percent) to two, 887 titles (33.5 percent) to three, and 368 (13.9 percent) to all four. Including the 1975 titles offered under RPI's 1976 program that were allocated to Lynn (a participant in the 1976 program), an average of 5.5 copies per title were allocated to the lead petitioners.

Lynn, the only lead petitioner who participated in RPI's 1976 program, was allocated 225 of the 345 BFL reprint titles (65.2 percent) offered exclusively under RPI's 1976 program. Lynn was allocated an average of 2.4 copies per title of these 225 titles.

Some of the petitioners investigated the possibility of having their allocated books transferred to institutions other than those already lined up by RPI. However, with one exception,[12]

---

[11]Under part I of the 1975 program, the "Acceptance of Subscription," "Bill of Sale," and "Warehouse Receipt" documents were dated between June 18, 1975, and June 26, 1975. Under part II of the 1975 program, these documents were dated Feb. 28, 1976, and Mar. 1, 1976. Lynn's documents in the 1976 program were dated June 26, 1976, and June 28, 1976.

[12]In connection with his subscription to part I of RPI's 1975 program, Maddox considered donating his allocated books to the Mt. Vernon Christian Academy (Mt. Vernon) in Atlanta, a private school that his children attended. Ultimately, he chose not to contribute to the school because it had been open for only a short time and he had some concern over its tax-exempt status. With respect to his subscription for part II of RPI's 1975 program, Maddox arranged with RPI for Mt. Vernon to select titles to receive. RPI allocated those titles to Maddox and Maddox directed that the books be donated to Mt. Vernon, executing a "Special Power of Attorney" form authorizing Joiner to transfer the books to Mt. Vernon. Mt. Vernon likewise executed a typical RPI "Special Power of Attorney" form stating that Joiner was its "Attorney in Fact" to accept the "donation."

each of the petitioners chose to have RPI arrange the donations of his allocated books and executed the "Special Power of Attorney" forms.[13] Each participating library selecting to receive each petitioner's allocated books likewise executed its respective "Special Power of Attorney" form. With respect to each corresponding petitioner and participating library, Joiner executed the appropriate "Declaration of Gift" and "Acknowledgement of Gift" forms in his purported dual capacity as "Attorney in Fact" for both the petitioner and the library.[14] Each library subsequently executed "Acknowledgement of Receipt" forms. Each library actually received the books so designated, books that, with one exception, each had selected to receive.[15] Each recipient library was a charitable organization under section 170(c) at the times the transfers of books to each occurred. Each petitioner received his respective section 170 statement prepared by RPI.

The petitioners never had physical possession of the books allocated to them. Except for Maddox, none of the petitioners ever saw their allocated books; Maddox saw the books he had directed be given to Mt. Vernon sometime after the transfer. Except for Maddox' connection with Mt. Vernon, by and large, none of the petitioners had ever donated books to, visited, or heard of the recipient libraries.

Each of the petitioners believed that he had the unrestricted right to deal with the books in whatever manner he chose. None of the various documents involved placed any restrictions on the rights of any participants to deal with the books, including their rights to sell them, to take possession of them, or to transfer them to any person or entity of their choice. There is no evidence that RPI ever treated or disposed of any participant's books in any manner different from or other than as "instructed" by the participant.

---

[13]Under part I of the 1975 program, petitioners' signatures on the "Request for Instructions" and "Special Power of Attorney" forms were dated between Nov. 21, 1975, and Nov. 29, 1975. Under part II of the 1975 program, these documents were dated between Oct. 6, 1976, and Nov. 2, 1976. Lynn's documents under the 1976 program were dated Dec. 15, 1976, and Dec. 30, 1976.

[14]Under part I of the 1975 program, these documents were dated Dec. 30, 1975. Under part II of the 1975 program, these documents were dated between Oct. 29, 1976, and Nov. 17, 1976. Lynn's documents under the 1976 program were dated Dec. 30, 1976.

[15]In connection with the books allocated to Neely under part II of the 1975 program, the initial library backed out. RPI searched for and found another library to accept the specific titles already allocated to Neely. Neely had to execute another "Special Power of Attorney" form.

*Valuation of the Subject Reprint Books*

## Content

The various BFL reprint titles involved in RPI's book contribution program consisted largely of anthologies of poems, short stories, essays, certain biographies, a collection of works on Black History, and various other fairly obscure works of relatively well-known authors. Such works are primarily needed in libraries where major research is conducted, such as university and college libraries and public libraries in large urban areas. Such works are generally beyond the research needs of the general public or public school students who patronize the smaller rural public libraries that received these books under RPI's book contribution program. Generally, such works in the collections of these small rural libraries are used relatively infrequently.

## Use of the RPI Books by the Recipient Libraries

Generally, the patrons of small rural public libraries such as those which received these books are interested in best sellers and current fiction and nonfiction, and purchases of scholarly reprint books are a rather low priority item for such libraries. The reactions of the various libraries when they received the BFL reprint books were mixed. Some of the libraries were generally pleased with the books they received and proceeded to catalog, shelve, and circulate the books. Others were less satisfied, discovering the nature of the books (college level research materials) for the first time upon receiving the books.

Also many of these small rural public libraries did not have the necessary indices or "finding tools" to enable their patrons to make effective use of those scholarly reprint books. Many of these libraries disposed of large numbers of these reprint books through donations to others institutions or through "flea market" sales at 25 to 50 cents per book. One librarian threw away virtually every book his library had received under the RPI program.[16]

---

[16]This librarian was not the one who had selected the books for the library to receive under RPI's solicitation, and he had a different view of the library's function and acquisition policy from that of the librarian who had selected the books. This was the case with several of the recipient libraries, and may explain some of the negative reaction to the books.

*Sales by BFL*

The RPI book contribution program included slightly more than 3,000 (3,023) of BFL's 7,000 titles. From 1974 through 1976, while RPI was operating its book contribution program, BFL continued to offer for sale its own inventory of its reprint books at its catalog retail list prices.

In 1975 and 1976, BFL sold at least four copies of every one of its reprint titles that were in the RPI program (except for its poetry series) to the Miami - Dade County Public Library System. In 1975, BFL sold a copy of every title in three of its catalogs in the RPI program (essay, short story, and poetry) to the library at the Evergreen State College in Olympia, Washington. In both cases, the libraries paid BFL's full catalog retail list prices. In both cases, the acquisitions-librarians had substantial funds available, appropriated funds that had to be spent by the end of the fiscal year or that would be restored to the budgetary authority supervising those libraries. Those two sales were atypical of BFL's business during the years before the Court. Those two sales harkened back to the big-budget, free-spending days of the 1960's, which helped to create the reprint publishing industry, and did not reflect the actual market realities of that industry by the years in question.

During these years, BFL's institutional library customers normally paid BFL's catalog retail list price, while its wholesale customers (book jobbers) paid approximately 90 percent of BFL's catalog retail list price. BFL's sales records for the year indicate the following:

| | *Including Miami-Dade and Evergreen sales* | *Excluding Miami-Dade and Evergreen sales* |
|---|---|---|
| Number of RPI titles as percentage of BFL sales of all titles ......... | 44.6% (14,284 out of 32,007) | 19.3% (483 out of 2,505) |
| Percentage of titles offered under RPI's 1975 program (including RPI's 1975 titles also offered in its 1976 program) sold by BFL during the years 1975–76........ | 100% | 15.0% |

|  | Including Miami-Dade and Evergreen sales | Excluding Miami-Dade and Evergreen sales |
|---|---|---|
| Percentage of titles offered exclusively under RPI's 1976 program sold by BFL during the years 1975–76 | 100% | 13.3% |
| Average number of copies per title of titles offered under RPI's 1975 program (including RPI's 1975 titles also offered in its 1976 program) sold by BFL during the years 1975–76 | 4.72% | 0.16% |
| Average number of copies per title of titles offered exclusively under RPI's 1976 program sold by BFL during the years 1975–76 | 4.79% | 0.145% |

BFL sold 32,007 reprint books in 1975 and 1976. Of the documented BFL sales in 1975 and 1976, slightly more than 80 percent of those BFL sales were sales of titles *not* included in the RPI book contribution program and slightly less than 20 percent (19.3) were sales of the same titles (excluding the Miami-Dade and Evergreen sales). Including the Miami-Dade and Evergreen sales, 44.6 percent of BFL's sales were sales of the same titles as those offered in the RPI program and slightly over 55 percent of the BFL sales were sales of titles *not* offered in RPI's program.

Considering only BFL's sales of the same reprint titles offered in the RPI book contribution program, BFL's sales included only 15.0 and 13.3 percent (excluding the Miami-Dade and Evergreen sales) of the total number of titles offered in the RPI program. In other words, BFL's actual sales of the RPI titles were negligible if the Miami-Dade and Evergreen sales are excluded.

Approximately 150,000 BFL reprint books were involved in the RPI book contribution program. In 1977, after RPI wound up its program, BFL repurchased the remaining reprint books from Embassy, approximately 350,000 books, paying 35 cents per book. BFL then resold these books, and its remaining reprint inventory to Arno Press (Arno), another reprint

publisher and seller, for approximately 53 cents per book.[17] Arno continued to offer for sale the BFL reprint titles at prices comparable to these in BFL's retail catalogs.

## Sales in the "Antiquarian" (Second-Hand) Book Market

The "antiquarian," out-of-print, or second-hand book market involves rare, used, or out-of-print (no longer available from original publisher) books. The connection between the antiquarian book industry and the reprint publishing industry is somewhat remote and nebulous. Some of the early reprint publishers were second-hand book dealers, and many of the titles first chosen for reprinting were titles that were very popular in the second-hand market. Prices for antiquarian or out-of-print books reflect various elements, including collectibility (rarity and condition) and informational content. In some instances, market prices for antiquarian, out-of-print, or second-hand books may be relevant in determining the fair market value of some of the BFL reprint books, but only to the extent that the informational content element of a particular reprint title can be segregated from the elements of the market price representing collectibility factors. Generally, however, the market prices for antiquarian, out-of-print, or second-hand books are not relevant to the fair market value of BFL reprint books. The BFL reprint books were neither rare nor used, and they were not out of print in the sense that they were readily available from BFL.

## Treatment by Petitioners on Their Returns

Each of the lead petitioners claimed deductions on his respective returns for charitable contributions of books to various libraries, as follows:

| Taxpayer | Year | Cost | Claimed value of contribution | Amount of deduction claimed |
|---|---|---|---|---|
| McCall | 1975 | $10,000 | $30,005.50 | $20,066.00 |
| Neely | 1975 | 10,000 | 30,009.25 | 30,009.25 |
| Neely | 1976 | 10,000 | 30,106.00 | 30,106.00 |
| Lynn | 1976 | 5,000 | 15,007.75 | 15,008.00 |
| McDermid | 1975 | 10,000 | 29,953.00 | 29,953.00 |

[17]BFL was also entitled to a royalty of 8 percent of revenues in excess of $2.5 million for the period between the Arno sale and April of 1982.

| Taxpayer | Year | Cost | Claimed value of contribution | Amount of deduction claimed |
|----------|------|------|-------------------------------|------------------------------|
| McDermid | 1976 | $10,000 | $30,138.75 | $28,400.00 |
| Maddox | 1975 | [18]7,500 | 22,558.50 | 22,558.50 |
| Maddox | 1976 | [18]7,500 | 22,502.25 | 22,502.25 |

Each petitioner's claimed fair market value is the BFL catalog retail list price for his respective allocated books. This figure was supplied to each petitioner by RPI on the section 170 statement each received from RPI. The lesser deductions claimed by McCall in 1975 and by McDermid in 1976 reflect the 30-percent limitation of section 170(b)(1)(C) on contributions of property. Pursuant to section 170(b)(1)(C), both McCall and McDermid attempted to carry over their unused contribution into subsequent years. Except for Neely in 1976, each petitioner attached to his respective return the section 170 statement furnished by RPI. Each petitioner actually paid to RPI as the cost of his subscription the cost figures listed above.

### ULTIMATE FINDINGS OF FACT

(1) Each of the petitioners purchased reprint books and made a contribution of those books to a qualified donee library.

(2) The fair market value of the books so contributed is no more than 20 percent of BFL's catalog retail list prices.

### OPINION

This case involves charitable contributions deductions claimed by the petitioners for their participation in a charitable contributions tax shelter program promoted by Reprints, Inc. (RPI), and its president and sole stockholder, Thomas Joiner (Joiner). Each petitioner "subscribed" to "units of participation" in RPI's "book contribution program." Each petitioner paid cash to RPI and received documents entitled "bill of sale" and "warehouse receipt" and an attached list of

---

[18]Although the parties stipulated that Maddox paid $10,000 in both 1975 and 1976, we are satisfied that the $7,500 figure is correct for both years. Maddox' subscription agreement shows the purchase of six units, three in 1975 (part I of the 1975 program) and three in 1976. RPI's 1975 offering memorandum lists the subscription price at $2,500 per unit and Maddox' subscription agreement states he had enclosed a check for $7,500, not for $10,000. Moreover, the claimed value of his contributions in both years, approximately $22,500, is more consistent with a purchase price of $7,500 than of $10,000, especially in light of the consistent three-for-one approach in RPI's tax shelter program.

books. These documents purported to evidence a purchase by each petitioner of reprint books published by BFL Communications, Inc. (BFL). Each petitioner purportedly purchased a quantity of BFL reprint books having aggregate publisher's catalog retail list prices in an amount 3 times the subscription price.

At the time these books were allocated to petitioners, RPI usually had already tentatively located libraries that were willing to receive reprint books they had selected. The allocation of books to petitioners thus corresponded to RPI's initial tentative allocation of books to those recipient libraries. Towards the end of each taxable year, RPI sent forms to the petitioners requesting "instructions" as to how petitioners wanted to dispose of their "books," specifically whether petitioners wanted to have RPI "consummate" their "donations" to the recipient libraries already tentatively identified, or whether they wished some other "disposition" of their "books." Each petitioner executed a form purporting to designate Joiner, RPI's president, as his "attorney in fact" for purposes of making a charitable contribution of his books. Each petitioner also signed the second endorsement on his warehouse receipt document or documents. At the same time, RPI again contacted the participating libraries tentatively selected as recipients to confirm their continuing willingness to receive the books. Each participating library was a qualified charitable donee under section 170, and each library executed a "special power of attorney" form purporting to designate Joiner as its "attorney in fact" for purposes of receiving and acknowledging the gift of books from the particular petitioner. Joiner, in his purported dual-agent capacity, executed a two-part document for each matched petitioner and library. The first part (as the petitioner's "attorney in fact") purported to declare a gift of books to the library, and the second part (as the library's "attorney in fact") purported to indicate the acceptance of such gift on behalf of the library. From the dates of the various "acceptance of subscription," "bill of sale," and "warehouse receipt" documents to the dates of each corresponding "deed of gift" and "acceptance of gift" document, each respective petitioner had "held" his "books" for slightly over 6 months, the capital gains holding period at that time. Joiner directed Embassy Book Services, Inc. (Embassy), the

warehouseman, to deliver the respective books to the respective libraries. Each library received the books purportedly given to it by the particular petitioner through Joiner. Each library executed a form entitled "acknowledgement of receipt," dated in the subsequent taxable year. RPI prepared the section 170 statement for petitioners to attach to their tax returns in claiming their charitable contributions of property. Each petitioner claimed a charitable contributions deduction for his gift of books to the various libraries, stating as the fair market value thereof the full catalog retail list prices charged by the publisher (BFL), an amount 3 times what each petitioner had paid for his alleged purchase of books.

Section 170(a)(1) allows as a deduction any contribution or gift to or for the use of an entity described in section 170(c), payment of which is made within the taxable year.[19] Where a taxpayer makes a contribution in property rather than cash, the amount of the charitable contribution deduction is generally the fair market value of the property at the time of the

---

[19] As in effect during the years in issue, sec. 170 provided in pertinent part:

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * *

\* \* \* \* \* \* \*

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

(1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

\* \* \* \* \* \* \*

(e) CERTAIN CONTRIBUTIONS OF ORDINARY INCOME AND CAPITAL GAIN PROPERTY.—

(1) GENERAL RULE.—The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of—

(A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), and

(B) in the case of a charitable contribution—

(i) of tangible personal property, if the use by the donee is unrelated to the purpose or function constituting the basis for its exemption under section 501 (or, in the case of a governmental unit, to any purpose or function described in subsection (c)), or

(ii) to or for the use of a private foundation (as defined in section 509(a)), other than a private foundation described in subsection (b)(1)(D),

50 percent (62 ½ percent, in the case of a corporation) of the amount of gain which would have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution).

For purposes of applying this paragraph (other than in the case of gain to which section 617(d)(1), 1245(a), 1250(a), 1251(c), 1252(a), or 1254(a) applies), property which is property used in the trade or business (as defined in section 1231(b)) shall be treated as a capital asset.

contribution. Sec. 1.170A–1(c)(1), Income Tax Regs.[20] However, the amount of any charitable contribution of property otherwise allowable is reduced by any ordinary gain the taxpayer would have recognized if he had sold rather than contributed the property. Sec. 170(e)(1)(A), note 19 *supra*. During the years in issue, the capital gains holding period was 6 months. Sec. 1223. In disallowing petitioners' claimed charitable contributions deductions in their entirety, respondent makes two principal arguments, which we shall address separately.

## I. Did Petitioners Make Charitable Contributions?

Respondent does not argue that the various documents purporting to evidence petitioners' acquisition and disposition of the books were not properly executed according to their terms by the various parties. Respondent does not seriously dispute the efficacy of these documents under State law. Indeed, respondent states that the effect of these documents under State law is "largely irrelevant." Finally, respondent concedes that the various libraries participating in RPI's book contribution program are all qualified charitable donees under section 170(c), and he admits that these libraries actually received the books that petitioners say they donated. Nonetheless, citing *Gregory v. Helvering*, 293 U.S. 465 (1935), respondent argues substance over form, contending that these various documents merely constitute a transaction wholly lacking in economic substance and reality, a sham transaction that should be completely disregarded for Federal tax purposes. Respondent argues that petitioners neither owned nor contributed books to the libraries, and that any contributions that were made were made by RPI, not petitioners. Respondent says that petitioners purchased tax deductions, not books. We cannot agree.

Respondent spent a great deal of time attempting to show that petitioners were completely inexperienced in every aspect of the book business and that petitioners had virtually no chance of realizing an economic profit from their alleged

---

[20]As in effect during the years in issue, sec. 1.170A–1(c)(1), Income Tax Regs., provided:

"If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution reduced as provided in section 170(e)(1) * * *"

acquisition and disposition of the reprint books. The record abundantly establishes that to be the case. Although we accept the truth of these matters, we have made no express findings on these facts because they are not pertinent to our inquiry. The deduction for charitable contributions provided by section 170 is a legislative subsidy for purely personal (as opposed to business) expenses of a taxpayer. Cf. *Davidson v. Commissioner*, 82 T.C. 434, 440–441 (1984). Accordingly, doctrines such as business purpose and an objective of economic profit are of little, if any, significance in determining whether petitioners have made charitable gifts. Cf. *Estelle Morris Trusts v. Commissioner*, 51 T.C. 20, 38–39, 43–44 (1968), affd. per curiam 427 F.2d 1361 (9th Cir. 1970); *Oakes v. Commissioner*, 44 T.C. 524, 532 (1965). We think that the various documents in fact comport with the economic substance and reality of these transactions, and we conclude that the petitioners did in fact own and contribute the books to the various libraries. Cf. *Dolese v. Commissioner*, 82 T.C. 830, 836–838 (1984).

First, petitioners obtained title to the books no later than the time they received the "bill of sale" and "warehouse receipt" documents from RPI. Uniform Commercial Code (UCC) secs. 2–401(3)(a), 1–201(14) and (15) (1976).[21] Since the warehouse receipt documents provided for delivery by the warehouseman, Embassy, to RPI's "order," the warehouse receipts were negotiable (U.C.C. sec. 7–104(1)(a) (1977)),[22] and accordingly, the risk of loss passed to the petitioners upon their receipt of the warehouse receipts. U.C.C. sec. 2–509(2)(a) (1976).[23] Consequently, upon receipt of the warehouse receipts, each petitioner's cash investment was fully subject to the risk

---

[21]See Fla. Stat. Ann. secs. 672.401(3)(a), 671.201(14) and (15) (West 1966, 1984 Supp.); Ga. Code Ann. secs. 11–2–401(3)(a), 11–1–201(14) and (15) (1982); N.J. Stat. Ann. secs. 12A:2–401(3)(a), 12A:1–201(14) and (15) (West 1962); N.C. Gen. Stat. secs. 25–2–401(3)(a), 25–1–201(14) and (15) (1965); Tenn. Code Ann. sec. 47–2–401(3)(a) (1979); Tenn. Code Ann. sec. 47–1–201(14) and (15) (1984 Supp.). Although McDermid's bills of sale were unsigned, the warehouse receipt was endorsed, and it was delivery to him of the warehouse receipt that effected passage of title to him. Since McDermid and RPI otherwise performed the agreement according to the terms of the offering memoranda and other documents, we do not think that Joiner's failure to sign the McDermid bills of sale on behalf of RPI in any way affects the validity of the transaction.

[22]See Fla. Stat. Ann. sec. 677.104(1)(a) (West 1966, 1984 Supp.); Ga. Code Ann. sec. 11–7–104(1)(a) (1982); N.J. Stat. Ann. sec. 12A:7–104(1)(a) (West 1962); N.C. Gen. Stat. sec. 25–7–104(1)(a) (1965); Tenn. Code Ann. sec. 47–7–104(1)(a) (1979).

[23]See Fla. Stat. Ann. sec. 672.509(2)(a) (West 1966, 1984 Supp.); Ga. Code Ann. sec. 11–2–509(2)(a) (1982); N.J. Stat. Ann. sec. 12A:2–509(2)(a) (West 1962); N.C. Gen. Stat. sec. 25–2–509(2)(a) (1965); Tenn. Code Ann. sec. 47–2–509(2)(a) (1979).

that the books might be destroyed, lost, or stolen.[24] Each petitioner also bore the risk that RPI would not be able to find a library willing to receive his books. More importantly, each petitioner faced the risk, very real because of BFL's precarious financial condition, that BFL would go out of business and not only undermine each petitioner's substantiation of his claimed fair market value under the book contribution program, but also largely destroy any possible market for the books. Also, both Embassy and RPI were new corporations with little experience in the book industry. That the only insurance apparently obtained for petitioners' books by RPI was simply for the amounts of RPI's option price with Embassy (25 cents to 35 cents per book) underscores the very real financial risk undertaken by petitioners.[25]

That petitioners never took actual physical possession of the books is also irrelevant. Although we look beyond bare legal title (see *Corliss v. Bowers*, 281 U.S. 376, 378 (1930)), it is the *right* to beneficial enjoyment of the property, and not the actual exercise of this right, that determines whether a taxpayer is to be recognized as the owner of property for Federal tax purposes. See generally *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237–1238 (1981);[26] *Yelencsics v. Commissioner*, 74 T.C. 1513, 1527 (1980). See also *Maysteel Products, Inc. v. Commissioner*, 33 T.C. 1021, 1025 (1960), revd. on another issue 287 F.2d 429 (7th Cir. 1961).

Respondent's reliance upon certain language in the documentation, such as "units of participation" and "subscription"

[24]Petitioners' risk was subject, of course, to Embassy's liability for its negligent acts or omissions. U.C.C. sec. 7–204. See Fla. Stat. Ann. sec. 677.204 (West 1966, 1984 Supp.); Ga. Code Ann. sec. 11–7–204 (1982); N.J. Stat. Ann. sec. 12A:7–204 (West 1962); N.C. Gen. Stat. sec. 25–7–204 (1965); Tenn. Code Ann. sec. 47–7–204 (1979).

[25]Had the books been lost or destroyed, petitioners may have had a breach of contract claim against RPI for its apparent failure to fully ensure the books. Because RPI itself was recently incorporated by Joiner, its sole shareholder, and because RPI's bottom-line profits in the book contribution program were far less than the cash paid by the petitioners, such a breach of contract action against RPI would hardly be adequate to protect petitioners against financial loss.

[26]*Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981), involved the question of whether a purported sale of cattle was to be recognized as a sale for Federal tax purposes. The Court found there was no sale because the taxpayers did not acquire the right to possession, control, or dominion over the cattle. Many of the factors listed in that case are relevant for determining ownership of property for Federal tax purposes generally—where legal title resides; the parties' treatment of the transaction; the parties' present obligations under the documents (execution of deed, payment, etc.); rights of possession; which party bears attendant costs, such as taxes; risk of loss or damage; and which party is entitled to any profits from the sale of the property.

and the like, is unavailing. Such terminology was used because RPI and its attorneys wanted to ensure that, if the book contribution programs were deemed "securities" under Federal or State securities laws, they would qualify for the "private offering" exception. The offering memoranda themselves so stated. Respondent's argument that the failure of the bill of sale documents to refer specifically to books meant that petitioners were not buying books is equally meritless. The bill of sale documents refer to the attached list of books. It is absolutely clear from the context of all the documents that RPI's program contemplated that the petitioners were purchasing books. Based on all the facts of this case (see *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. at 1237), we are convinced that petitioners did in fact purchase books from RPI.

We are likewise convinced that petitioners actually contributed their books to the libraries. Since the petitioners were in fact the owners of the books, we reject respondent's assertion that any transfer of the books to the libraries was by RPI rather than by petitioners. RPI did not own the books; consequently, RPI could not, except as petitioners' agent, transfer those books to the libraries. RPI's continuing actions in the book contribution programs, specifically its request for instructions from the taxpayers and corresponding inquiries to proposed recipient libraries, do not evidence any dominion over the books on RPI's part. RPI's actions were merely part of the services RPI promised to perform for petitioners, as set forth in the offering memoranda, and part of what petitioners paid for under their contracts.

Petitioners' post-dating of their endorsements of the warehouse receipts is also of little consequence. Petitioners' endorsement in blank of the warehouse receipts did not constitute a negotiation of those documents. Such negotiation was completed only upon delivery of the documents of title. U.C.C. sec. 7–501(1) and (3) (1977).[27] There was no delivery until at least the time Joiner executed the respective declarations of gift on behalf of the respective petitioners.

---

[27]See Fla. Stat. Ann. sec. 677.501(1) and (3) (West 1966 & Supp. 1984); Ga. Code Ann. sec. 11–7–501(1) and (3) (1982); N.J. Stat. Ann. sec. 12A:7–501(1) and (3) (West 1962); N.C. Gen. Stat. sec. 25–7–501(1) and (3) (1965); Tenn. Code Ann. sec. 47–7–501(1) and (3) (1979).

Neither does petitioners' use of Joiner as an agent undermine the reality and substance of the transactions as gifts by the petitioners. Although a charitable contribution is not made until delivery of the gift is accomplished (sec. 1.170A–1(b), Income Tax Regs.), a charitable contribution may be effected through an agent acting on behalf of the donor, and may be made to an agent acting on behalf of the donee. See *Greer v. Commissioner*, 70 T.C. 294, 304 (1978), affd. on other issues in an unpublished opinion 634 F.2d 1044 (6th Cir. 1980); *Broussard v. Commissioner*, 16 T.C. 23, 27 (1951); *Mellon v. Commissioner*, 36 B.T.A. 977, 1065 (1937). See also *Dulin v. Commissioner*, 70 F.2d 828, 830 (6th Cir. 1934); *Guest v. Commissioner*, 77 T.C. 9, 16–17 (1981); *Witt's Estate v. Fahs*, 160 F. Supp. 521 (S.D. Fla. 1956). The crucial question in such cases is whether the donor has effectively parted with dominion and control over the subject matter of the gift. See *Guest v. Commissioner*, 77 T.C. at 15–17; *Glynn v. Commissioner*, 76 T.C. 116, 122 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982); *Londen v. Commissioner*, 45 T.C. 106, 110 (1965). All of the power of attorney forms signed by petitioners appear facially proper and sufficient to denominate Joiner as agent for the limited purpose of making the gift of books to the libraries. Likewise, the libraries' respective power of attorney forms appear equally sufficient and proper to designate Joiner as their agent to receive the books. We think that petitioners' dominion over the books ended when Joiner, on behalf of the various libraries, acknowledged the gifts.[28]

It is clear that petitioners, not RPI or Joiner, decided what to do with their respective books. Petitioners, not RPI or Joiner, decided that the books would be contributed to the various libraries. This is underscored by the fact that several of the RPI program subscribers (including petitioner Maddox) themselves located and designated the libraries to receive

---

[28]Joiner's dual status as agent of both the donor taxpayers and the donee libraries does not invalidate the agency relationship for tax purposes. The fact remains that the libraries did receive the various books at the direction of the respective petitioners. Disregarding Joiner as agent of the libraries would postpone delivery for tax purposes until actual receipt by the libraries. However, respondent has not disputed the timing of petitioners' charitable contributions deductions by seeking to disregard Joiner as agent of the libraries; he disputes the fact of contributions at all. Accordingly, we do not address the question of the timing of the contributions resulting from Joider's dual agency. But see *Witt's Estate v. Fahs*, 160 F. Supp. 521 (S.D. Fla. 1956), recognizing the U.S. mail as dual "agent" of both donor and donee, and *Broussard v. Commissioner*, 16 T.C. 23 (1951), recognizing the taxpayer as the donee's "agent."

their books, rather than relying upon RPI. Other subscribers, including some of the lead petitioners in these cases, seriously considered donating their books to libraries (or schools) other than those located by RPI. We would be more sympathetic to respondent's substance over form argument if the facts showed that RPI disregarded the wishes or directions of the various petitioners or of the libraries, but the facts of record are otherwise. RPI scrupulously observed and recognized petitioners' status as owners of the books and meticulously followed their directions in disposing of the books.

Despite his protests to the contrary, respondent's seeming obsession with the mechanics of these transactions as shams appears to be caused by the admitted tax-avoidance motivation of the various petitioners. However, as stated above, the deduction for charitable contributions was intended to provide a tax incentive for taxpayers to support charities. Consequently, a taxpayer's desire to avoid or eliminate taxes by contributing cash or property to charities cannot be used as a basis for disallowing the deduction for that charitable contribution. See *DeWitt v. United States*, 204 Ct. Cl. 274, 503 F.2d 1406 (1974); *Waller v. Commissioner*, 39 T.C. 665, 676–677 (1963); *Maysteel Products, Inc. v. Commissioner*, 33 T.C. at 1024–1025.[29] Cf. *Estelle Morris Trusts v. Commissioner, supra.*

Respondent does not argue that petitioners retained actual beneficial use or enjoyment of the property they claimed to have contributed. Compare *Davis v. Commissioner*, 81 T.C. 806, 817 (1983). Neither does respondent contend that petitioners received some economic benefit or consideration, other than the expected tax deduction, as the quid pro quo for their charitable contributions. Compare *Singer Co. v. United States*, 196 Ct. Cl. 90, 449 F.2d 413 (1971); *Howard v. Commissioner*, 39 T.C. 833 (1963); *DeJong v. Commissioner*, 36 T.C. 896 (1961), affd. 309 F.2d 373 (9th Cir. 1962).

Under *Gregory v. Helvering*, 293 U.S. at 469, so heavily relied upon by respondent, the determinative question is "whether what was done, apart from the tax motive, was the thing which the statute intended." Here, at each petitioner's direction, various qualified charitable donees received gifts of books belonging to the respective petitioners. This is precisely

---

[29]See also *Grossman v. Commissioner*, T.C. Memo. 1973–219.

the result intended by section 170. Petitioners owned the reprint books and made contributions of those books to the various libraries, and we hold that petitioners are entitled to deductions for their charitable contributions.

## II. Fair Market Value of the Donated Books

The amount of the deduction to which each petitioner is entitled under section 170 for his contribution of books to the various libraries depends upon the fair market value of the books at the time of the contribution. Sec. 1.170A–1(c)(1), Income Tax Regs., note 20 *supra*. Section 1.170A–1(c)(2), Income Tax Regs., defines fair market value as—

the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed. The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, but if he sells only at retail the usual market consists of his retail customers.

Fair market value is a question of fact to be determined from the entire record. *Zmuda v. Commissioner*, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); *Estate of DeBie v. Commissioner*, 56 T.C. 876, 894 (1971).

In support of his position that petitioners' books were of negligible value, respondent called three expert witnesses, each of whom was preeminent in his field. Respondent's first witness, Kenneth S. Giniger, had extensive experience in the publishing industry, including experience as managing officer of many book publishers and as an independent consultant to other publishing companies. The author of 11 books and numerous other publications about the publishing industry, Giniger was also an assistant professor of publishing at New York University, teaching courses and seminars on the business of book publishing, book publishing and the law, and author-publisher agreements. Giniger concluded that the fair market value of the books given to the libraries by the respective petitioners was no greater than 10 percent of BFL's

catalog retail list prices. This 10-percent figure represented Giniger's opinion of the wholesale price that would be paid by a dealer in excess inventory.

Respondent's second expert witness, Leonard Shatzkin, also had extensive experience in the publishing industry, first in the mechanical aspects of book publishing and later in the business aspects of it. At the time of trial, Shatzkin was a publishing consultant. Shatzkin determined that the fair market value of the books was no greater than 5 cents each. Shatzkin derived this price from BFL's sale to Embassy in 1973, which he determined to be an "arm's-length" sale of excessive inventory between a willing buyer and seller.

Respondent's final expert witness was Andrew Farkas. Although Farkas had approximately 3 years' experience in the publishing industry, working for what was then the world's largest dealer in second-hand and scholarly reprint books, his major experience was in librarianship. Farkas was both director of libraries and a professor of library science at the University of North Florida. Farkas testified about general library acquisitions policies, both of an institutional academic library like the University of North Florida and also those of small rural public libraries. Farkas viewed RPI's book contribution program as essentially dumping, upon undertrained, inexperienced, and naive librarians at the small rural public libraries, books that were largely useless to those libraries. Farkas testified that the fair market value of the books was no greater than 55 cents per book, the aggregate sum of the maximum option price payable by RPI to Embassy, plus Embassy's maximum reimbursement for storage and shipping expenses; nominally payable by BFL but effectively paid by RPI. Farkas viewed this as a contemporaneous arm's-length price negotiated between RPI and Embassy and corroborated his conclusion by referring to BFL's 1977 sale of its remaining reprint inventory at approximately 53 cents per book.

Each of respondent's valuation witnesses had a basic flaw in his analysis—each determined fair market value essentially on a wholesale rather than a retail basis. Although the regulations under section 170 do not specify whether a wholesale or retail market is to be used, the answer clearly provided elsewhere is that the retail market must be used under the circumstances existing herein. See sec. 20.2031–1(b),

Estate Tax Regs.; sec. 25.2512–1, Gift Tax Regs.;[30] *Goldman v. Commissioner*, 388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966); *Anselmo v. Commissioner*, 80 T.C. 872, 881–884 (1983).[31] These analogous regulations and the pertinent case law thus direct us to look at the market in which the property ordinarily is sold to its ultimate consumer. With respect to the reprint books here in issue, that is clearly the retail market place, comprised largely of institutional buyers (libraries) and, to a minor extent, of individuals seeking a specific scholarly text published by BFL. Since all of respondent's expert witnesses focused primarily on wholesale prices paid by retail sellers of excess inventory, their use of an improper market renders their analyses and opinions of little assistance for our purposes.

We also do not think that the usefulness of these books to the recipient libraries, or the actual use or disposition of some of these books by some of the libraries, has any great bearing on the fair market value of the books. That the recipient libraries would not or could not have purchased these books does not mean that the books were worthless in the market in which they were ordinarily sold to ultimate consumers. Likewise, the subsequent "flea market" sales and abandonment of some of the books by some of the recipient libraries do not establish that the books were necessarily of no value or of only nominal value in their ordinary market. Cf. *McGuire v. Commissioner*, 44 T.C. 801 (1965). These recipient libraries, by and large, did not purchase BFL reprint books because those books were essentially college level research materials of little use to the vast majority of the patrons of those libraries. Nonetheless, many of the libraries shelved and circulated some of the RPI-BFL reprint books they received. Use of the property by the donee can be a factor in valuation. *Guggenheim v. Rasquin*, 312 U.S. 254, 257 (1941); *Cupler v. Commissioner*, 64 T.C. 946, 955 (1975). On the facts of this case, the use and disposition by the libraries tend to indicate a small value,

---

[30]The test of fair market value for estate and gift tax purposes is generally the same as that for charitable contribution deduction purposes. *United States v. Parker*, 376 F.2d 402, 408 (5th Cir. 1967); *Anselmo v. Commissioner*, 80 T.C. 872, 881 (1983).

[31]See also *Alma Piston Co. v. Commissioner*, T.C. Memo. 1976–107, affd. 579 F.2d 1000 (6th Cir. 1978).

but we cannot say, as respondent argues, that the reprint books were essentially worthless.[32]

In making their arguments on a fair market value, petitioners at least attempted to examine the proper market, i.e., the retail market to the ultimate consumers. Petitioners argue that the fair market value of these reprint books is BFL's catalog retail list prices.

To buttress their argument, petitioners rely upon actual sales of reprint books by BFL, the publisher, at its catalog retail list prices and upon retail prices in the antiquarian, out-of-print, or second-hand market of used original edition copies of identical titles, to the extent such prices in that antiquarian market reflect solely the informational content of the books (i.e., excluding collectibility factors). To establish this second point, petitioners' expert witness, John Albers, attempted to construct an elaborate statistical model to establish a correlation between BFL's catalog retail list prices and the retail prices (based solely on the informational content) of used original edition copies of identical titles in the antiquarian or second-hand book market. Albers concluded that there was a close correlation, but we disagree. The BFL reprint books were neither rare nor used, and they were not out of print in the sense that they were not readily available from the publisher, BFL. Without going into the details of Albers' methodology, or of his statistics generally, it is sufficient to state that we are adequately persuaded by respondent's rebuttal expert witness that Albers' conclusion is not statistically valid because of his failure to employ proper statistical techniques. Titles from certain BFL catalogs were over-sampled, and titles from certain other BFL catalogs were under-sampled. Moreover, Albers valued only 709 titles of the over 3,000 titles in the RPI book contribution program. Also, Albers valued only those titles as to which price information was readily and conve-

---

[32]Moreover, these factors seem to relate more to respondent's arguments that, at the most, petitioners' deductions should be limited to their actual cash expenditure. While the libraries' use and disposition of these books might be useful in applying the limitation of sec. 170(e)(1)(B)(i) (see note 19 *supra*), our determination as to the fair market value of the books in this case renders it unnecessary to ascertain whether the libraries' use of these particular books was unrelated to their exempt function under sec. 170(e)(1)(B)(i). Our fair market value determination renders moot respondent's alternative argument that petitioners should be considered as dealers under sec. 170(e)(1)(A) (note 19 *supra*). In other words, since we find the fair market value to be less than the cash paid for each taxpayer's subscription to the RPI book contribution program, we need not address any of respondent's alternative arguments.

niently available to him. The absence of price information might well suggest that there was no market for the title at all.

However, the major flaw in petitioners' valuation approach—in the reliance upon both retail sales by the publisher (BFL) and retail sales of the same titles (based on informational content) in the second-hand, antiquarian market—is petitioners' failure to consider the sheer numbers of books that are to be valued for each petitioner. As against this, the information relied upon by petitioners is simply insufficient to represent the large universe of reprint titles the Court is called upon to value.

As detailed in our findings of fact, when BFL's reprint book sales to Miami-Dade Public Library and Evergreen State College are excluded from the documented sales, BFL's actual sales of the reprint titles offered under RPI's program are negligible (only 15.0 and 13.3 percent of the titles in the RPI program, and an average of .16 and .145 copes per title). Even including the Miami-Dade and Evergreen sales,[33] the number of books sold to just the five lead petitioners in this case exceeded BFL's total documented sales of the RPI titles for 1975 and 1976. As further detailed in our findings of fact, approximately 98.8 percent of the available 2,678 titles in RPI's 1975 program were sold to the five lead petitioners. Among the five, they received an average of 5.5 copies per title, which exceeded the 4.72-copies-per-title average sales of these same titles (even including Miami-Dade and Evergreen sales) by BFL during 1975 and 1976.[34]

When the average of book quantities sold to the lead petitioners is extrapolated to all 11 taxpayers in these consolidated cases, it becomes obvious that the sheer quantity of books in the RPI book contribution program substantially exceeds BFL's total 1975 and 1976 sales of all reprint titles, even including the Evergreen and Miami-Dade sales. Moreover, when the average of those book quantities is extrapolated

---

[33]Respondent strongly argues that we should ignore the Evergreen and Miami-Dade sales. Although respondent has the better of the argument, our ultimate determination of fair market value is unaffected by the inclusion or exclusion of the Evergreen and Miami-Dade sales.

[34]Because only one of the five lead petitioners (Lynn) participated in RPI's 1976 program, the direct comparison of BFL sales of the same titles to RPI's sale to Lynn is not as stark as the 1975 data. However, looking just at Lynn alone, he received copies of 65.2 percent of the titles offered exclusively under RPI's 1976 program, receiving an average of 2.4 copies per title.

to the approximately 40 separate taxpayer participants in RPI's book contribution program, BFL's actual sales of all reprint titles during the 2-year period, even including the Evergreen and Miami-Dade sales, become insignificant in comparison.[35] Most of BFL's actual documented sales were of titles not included in the RPI book contribution program.[36] Even if we accepted BFL's catalog list price at face value, we think the sheer number of books to be valued for each petitioner would require a substantial discount from that price. The simultaneous marketing of all those books would substantially depress the market for each particular reprint title and for the multiple copies of each title. See note 35 *supra*. See *Jarre v. Commissioner*, 64 T.C. 183, 189–190 (1975); *Estate of Smith v. Commissioner*, 57 T.C. 650 (1972), affd. on other issues 510 F.2d 479 (2d Cir. 1975).

Moreover, petitioners' reliance upon the publisher's catalog retail list prices for these books is also flawed because it ignores the fact that the reprint books in the RPI programs represented BFL's excess inventory. The parties' various expert witnesses expressed divergent views on the applicability of certain concepts of the general publishing market to the

---

[35]Approximately 150,000 books were cycled through RPI's contribution program. This 150,000 figure is the approximate number available under RPI's option, and equals the approximate number disposed of by Embassy between its original acquisition of the 500,000 excess BFL books in 1973 and its 1977 resale of 350,000 of those books to BFL. Since slightly over 3,000 separate titles were available to RPI, this would indicate that an average of approximately 50 copies per title were cycled through RPI's contribution program.

[36]Petitioners argue, however, that BFL's actual sales were much higher than those documented sales upon which we have based our findings of fact. Harvey Roth, BFL's president during 1975–76, so testified. An officer of a large Georgia book wholesaler (Baker & Taylor) also testified that his employer had purchased approximately $136,000 worth of books from BFL in 1975, receiving a discount of 10 percent off BFL's list prices. However, since Baker & Taylor did not maintain any inventory of BFL reprint books and purchased them only as requested by their customers, the Court assumes that most, if not all, of these sales are already included in the Form 10-K figures discussed below. Petitioners pointed to BFL's financial statements taken from Forms 10-K filed with the Securities and Exchange Commission, showing total sales of approximately $1.3 million in 1975 and $900,000 in 1976. This evidence was equivocal at best. None of it relates to the specific titles offered under RPI's book contribution programs, only 3,000 of the approximately 7,000 titles BFL sold. BFL's documented sales, upon which we have based our findings, show that greater than a majority of such sales (and over 80 percent excluding the Evergreen and Miami-Dade sales) were of titles *not* offered in RPI's programs. There is no basis for inferring that the split would be any different among any additional undocumented sales. The actual amounts of BFL's undocumented sales of RPI's reprint titles were also less than they first appear to have been. The total sales shown on BFL's Forms 10-K to the SEC also include sales by a subsidiary, Nash Publishing, which did not sell any of the reprint titles and sold only original works (trade publications or trade books). Moreover, these sales figures also appear to include BFL's commissions from RPI, which, over the period should have been approximately $200,000 to $250,000. In short, the evidence of additional sales by BFL of the BFL - RPI titles is not persuasive.

"specialized" reprint market. Accordingly, we have refrained from characterizing BFL's sale to Embassy or any of the other transactions as "remainder" sales, whether "full" or "partial." While the parties dispute terminology and certain basic concepts, they do not, and cannot, seriously dispute that BFL's 1973 sale to Embassy of 500,000 reprint books was a disposition by BFL of its excess inventory, that is to say, inventory that it was unable to sell in the ordinary course of its business. The test of fair market value contemplates a willing seller and a willing buyer, both with knowledge of all the relevant facts. A willing retail buyer of the reprint books owned by petitioners would know that those books constituted excess inventory of the publisher. Such a knowing buyer would demand and receive a substantial discount for his purchase of any of this excess inventory, particularly for a quantity of 2,000 to 3,000 books such as some of the libraries received, regardless of whether it was called a full remainder, a partial remainder, or some other colorful nomenclature.

Petitioners' approach also ignores the overall weakness of the market for scholarly reprint books during the 1970's. As detailed in our findings, Government funding for library book acquisitions was severely cut, sharply reducing the demand for these kinds of books. A large number of reprint publishers were forced out of business by the diminished market of the 1970's. In 1977, shortly after RPI wound up its reprint book contribution program, BFL itself was forced to sell its remaining inventory and to terminate its reprint business. Since BFL itself could not stay in business selling its books at its catalog retail list prices, it is wholly unrealistic to suggest that those catalog retail list prices accurately measure the fair market value of petitioners' BFL reprint books.

In some cases, such basic errors in valuation methodology by both parties might leave the Court with no factual basis for determining the fair market value, resulting in a determination based solely upon burden of proof. See *Anselmo v. Commissioner*, 80 T.C. at 885–886. Fortunately, we need not rely upon burden of proof, for, after sifting through the mountains of chaff[37] in these consolidated cases, a few grains

---

[37]This case was tried and briefed exhaustively by the parties. Respondent's brief contained 674 requested findings of fact and petitioners' brief contained 252, with lengthy objections by each side to a majority of the findings proposed by the opposing side. Actually, most of the basic facts in the

of wheat remain. Giniger, one of respondent's experts did discuss the retail price ranges charged by a dealer in excess inventory books. Giniger testified that such a dealer would normally purchase a publisher's excess inventory at 5 to 10 percent of the publisher's catalog list price and attempt to resell those books to its own customers at 3 to 4 times his own cost. Both the dealer's purchase price and his markup would depend upon the quantity of books he purchased and upon his perception of the turn-around time to sell them. Such a dealer would pay the publisher less and mark up more for larger quantities of books that he could not quickly resell. Accordingly, such a retail dealer's retail prices to the ultimate consumers would generally range between 15 to 30 percent of the publisher's list price.

Although the number of books to be valued in this case is exceedingly large, and although the market for scholarly reprint books was weak, both the sales by BFL and the sales of some of the same titles (based on informational content) in the second-hand or antiquarian market, indicate that there was some demand for some of the BFL titles offered under RPI's contribution program. For that reason we cannot accept respondent's argument that petitioners' books were worthless. Since we think these books had some value and that there was some market for the books, albeit a weak one, we conclude that the fair market value can reasonably be found in this range of 15 to 30 percent of the publisher's catalog retail list prices. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930).

Our conclusion is bolstered by another pertinent factor, namely, RPI's total cash price (which was contemporaneous with petitioners' on purchases) for these books—16.67 percent and 18.17 percent of BFL's catalog retail list price. Cf. *Siegel v. Commissioner*, 78 T.C. 659, 686–688 (1982). As detailed in our findings of fact, these figures actually represented RPI's total cash price paid to Embassy and BFL. Contrary to respondent's argument, RPI's cash price was *not* a function of the contemplated tax benefits to the ultimate book contribution program participants.[38] BFL had already sold its excess inventory to

---

case were little disputed, but both parties labored long and hard to put their differing "gloss" or "twist" upon almost every requested finding.

[38]Conversely, the cash price paid *to RPI* by the petitioners was, in large part, a function of their contemplated "tax profit." These 50-percent bracket taxpayers, claiming charitable contributions

Embassy at 5 cents per book. Because of the restriction against domestic resale by Embassy, BFL was protected against any impairment of its domestic market by Embassy's sale of this excess inventory. In the transaction with RPI, BFL consciously bargained away that restriction on domestic resale in exchange for the negotiated commission. We think this price was set largely by arm's-length bargaining among RPI (Joiner), BFL, and Embassy. On the one hand, RPI was motivated to pay the lowest possible price to both BFL and Embassy in order to maximize its profits on its resale of the books to participants in the tax shelter program. BFL and Embassy, knowing that RPI could not put together its program without the waiver of the restriction on domestic sales, were in a position to hold out for as much as they could reasonably extract from RPI. Moreover, if anything, the commissions RPI paid to BFL (effectively RPI's total cash price) were somewhat *less* than fair market value of those books. Although BFL waived the *legal* restriction on domestic retail sale and distribution, as a practical matter, BFL knew that RPI's resale and the petitioners' contributions of these books to libraries would not significantly affect the domestic market for its books because virtually all such books were going to end up in the hands of small rural public libraries that were *not* BFL's primary customers. Had BFL believed that RPI's book contribution program would endanger its domestic market, BFL undoubtedly would have held out for a higher price.

In determining the fair market value of these BFL reprint books, we recognize that our task involves an "inherently imprecise process" and is "capable of resolution only by Solomon-like pronouncement." See *Estate of Smith v. Commis-*

---

3 times their cash investment, expected to reap a tax profit (tax reduction) 1½ times their cash investment. Since their cash price was artificially set to give RPI its cash profit and the taxpayers their expected tax profit, we do not consider their actual cash investment relevant in ascertaining the actual fair market value of the books *as books*. Moreover, the subscription prices paid to RPI by the petitioners covered more than just what they paid for the books as books: Those prices included, in addition to RPI's profit (some 20 percent of the subscription price), some amounts for insurance, storage, packaging, shipping, and other services of the book contribution program. For these reasons, we reject any suggestion that the fair market value of the books must be no less than what petitioners actually paid to RPI. We are keenly aware that petitioners could have donated $10,000 in cash to the libraries directly and would be entitled to a deduction for the full amount of their cash contribution. We are also well aware that some of these petitioners candidly admitted they would not have entered into the book contribution program if they had thought their deduction would be limited to their out-of-pocket cash expenditure. Those factors are irrelevant. The contributions to the libraries were contributions of books, and our task is to determine the fair market value of the books as books.

*sioner*, 57 T.C. at 655; *Messing v. Commissioner*, 48 T.C. 502, 512 (1967). However, exercising our best judgment based on all the pertinent facts of record in this case—particularly the sheer volume of BFL reprint books cycled through RPI's contribution program, the large number of books these petitioners acquired, the nature of these books as BFL's excess inventory, and the depressed market conditions—we conclude that the fair market value of the books contributed by the petitioners was no more than 20 percent of the BFL catalog retail list prices for these books. That is the amount of petitioners' allowable deductions for their charitable contributions of books to the libraries.

To reflect this holding,

*Decisions will be entered under Rule 155.*