ALEXANDER AND AUDREY WEINTROB, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Weintrob v. Commissioner
Docket Nos. 16275-88, 17283-88, 18401-88, 18421-88, 18422-88, 18423-88, 18537-88, 18710-88, 18711-88, 18712-88, 18714-88, 18774-88, 18775-88, 21063-88, 31044-88, 8540-89
United States Tax Court
T.C. Memo 1990-513; 1990 Tax Ct. Memo LEXIS 566; 60 T.C.M. (CCH) 895; T.C.M. (RIA) 90513; September 25, 1990, Filed *566 Decisions will be entered under Rule 155. Wallace Musoff and Allan T. Cannon, for the petitioners. John E. Becker, Jr. and Drita Tonuzi, for the respondent. TANNENWALD, Judge. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in, and additions to, income tax for the taxable year 1984 for the following petitioners: Additions to Tax Under Sections
Petitioner
Deficiency
[2] 6653(a)(1)
6653(a)(2)
6661
Alexander
$ 18,424.00
$   921.20
*
$  4,606.00
and Audrey
Weintrob
Edward and
18,654.00
933.00
*
4,664.00
Jennie
Bernstein
Herbert and
67,111.00 3,355.55
*
16,777.75
Sandra
Kasper
John T. and
67,702.00
3,385.00
*
16,925.00
Delores K.
Wagner
Anthony A.
98,741.00
4,937.05
*
24,685.25
and Karen M.
Martino
Stephan Weiss
94,113.00
4,705.65
*
23,408.25
and Donna Karan
Russell E.
$ 20,028.00
$ 1,001.00
*
$  5,007.00
and Frances
L. Fitzgerald
Gary and
75,786.00
3,789.30
*
16,864.75
Marsha Forman
Daniel and
65,244.00
3,262.20
*
16,311.00
Sally Rhode
Edgar B. and
26,112.00
1,305.60
*
1,528.00
Mary B. Wilson
William C.
19,009.00
950.00
*
4,752.00
and Susan H.
Koch
Bruce M. and
46,568.00
2,328.40
*
11,642.00
Lisa R.
Ginsburg
Mark A. and
10,892.00
544.60
*
2,723.00
Rita J. Blatt
Arthur
13,781.00
689.00
*
3,445.00
and Ethel
Dickler
Ellis L. and
36,079.00
1,804.00
*
9,020.00
Sivia V.
Elgart
*567 In addition, for the taxable year 1983, respondent determined a deficiency in petitioners William N. and Leabelle M. Waite's income tax in the amount of $ 11,742.00 and additions to tax pursuant to section 6653(a)(1) of $ 587.00, section 6653(a)(2), and section 6659 in the amount of $ 3,523.00. Pursuant to section 6621(c), respondent increased the interest rate for the underlying deficiencies for all petitioners. After concessions, the issues for decision are: (1) whether charitable contributions of finished gravesites should be respected for tax purposes, and, if so, the value of the charitable contributions, (2) whether the exchange of unimproved land for finished gravesites is a tax-free exchange within the meaning of section 1031, (3) whether petitioners are entitled to deductions for tax consulting fees under section 212, (4) whether petitioners are liable for additions to tax *568 under sections 6653(a)(1) and (2), 6659, 6661, and (5) whether the transactions were tax motivated within the meaning of section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated herein by reference. At the time of the filing of their petitions, petitioners maintained their residences as follows: Petitioner
Residence
Alexander and
New York, New York
Audrey Weintrob
Edward Bernstein and Jennie
Riviera Beach, Florida
Bernstein
Herbert Kasper and
New York, New York
Sandra Kasper
John T. Wagner and
Philadelphia, Pennsylvania
Delores K. Wagner
Anthony A. Martino and
Radnor, Pennsylvania
Karen M. Martino
Stephan Weiss and
New York, New York
Donna Karan
Russell E. Fitzgerald and
Gladwyne, Pennsylvania
Frances L. Fitzgerald
Gary Forman and Marsha
Pomona, New York
Forman
Daniel Rhode and Sally
Newtown Square, Pennsylvania
Rhode
Edgar B. Wilson and
New York, New York
Mary B. Wilson
William C. Koch and Susan
Fort Washington, Pennsylvania
H. Koch
Bruce M. Ginsburg and Lisa
Narberth, Pennsylvania
R. Ginsburg
Mark A. Blatt and Rita
Bala Cynwyd, Pennsylvania
J. Blatt
William N. Waite and
York, Pennsylvania
Leabelle M. Waite
Arthur Dickler and
Bala Cynwyd, Pennsylvania
Ethel Dickler
Ellis L. Elgart and
Wynwood, Pennsylvania
Sivia V. Elgart
*569 Forest Green Venture
In 1964, Louis Beck, an attorney anda certified public accountant, formed Forest Green Venture (FGV) as a joint venture. FGV raised funds and purchased 131 acres of land zoned for cemetery use in the area of Morganville, New Jersey, for $ 5,500 per acre. Approximately 300 people invested in FGV. In 1964, FGV donated 5.5 acres to the Forest Green Park Cemetery Association (Cemetery) which was used as a cemetery. In October 1964, Cemetery entered into an agreement with FGV in which Cemetery agreed to purchase before October 14, 1974, 30 acres from FGV for $ 60,000 per acre, and in 1969, the purchase was closed. In May 1975, FGV became a limited partnership, with Mr. Beck as the sole general partner. FGV, as the owner of approximately 95.5 acres of unimproved land in Cemetery, permitted its partners to withdraw unimproved land, in proportion to their capital account ratios, which could be held by the individual partner or exchanged with FGV for finished gravesites, which were in Cemetery's inventory. The partner reported a capital gain on this exchange in the amount of the difference between the sales price per gravesite (less an 18-percent discount for illiquidity) *570 multiplied by the number of gravesites less his basis, which was equal to the partnership's basis for the equivalent amount of land previously withdrawn. The partner could hold the finished gravesites, donate the finished gravesites to a charity of his choice, or donate the finished gravesite to a charity that had previously notified Mr. Beck that it wanted to receive such donations. In all cases, the partners let Mr. Beck select the charitable donee. Under an August 1982 settlement with the IRS (Forest Green settlement), the FGV partners were allowed charitable deductions for years through 1982 in an amount equal to Cemetery's sale price for the finished gravesites less an 18-percent discount. Limerick Garden of Memories Cemetery
Limerick Garden of Memories Cemetery (Limerick) is an incorporated cemetery located in Limerick, Pennsylvania. In 1973, Anthony P. Pino acquired Limerick, and in February 1974, Mr. Pino incorporated A. P. Pino and Associates, Inc. (Associates), his wholly owned corporation. Shortly after incorporation, Associates entered into a long-term management agreement with Limerick and has operated Limerick since that time. Prior to December 1983, Limerick owned *571 approximately 60 acres, of which approximately 28 acres were improved for burial and 30.563 acres were unimproved. In addition to conducting burial activities, Limerick also furnished financial planning services, particularly life insurance, in connection with its sales of gravesites. E & D Investors
Petitioners Ellis Elgart and Arthur Dickler are certified public accountants, and during the years in issue, they were the principals of Elgart, Dickler and Company, an accounting firm. Mr. Elgart was a limited partner of FGV, and Mr. Elgart and Mr. Dickler were also general partners of Tragle and Company, a limited partner in FGV. In November 1983, Mr. Elgart and Mr. Dickler formed E & D Investors (E & D), a limited partnership in which they were the general partners and Mr. Beck was the initial limited partner. On December 15, 1983, E & D purchased the 30.563 acres of unimproved land from Limerick for $ 6,000 per acre (total purchase price equalling $ 183,378). Since approximately 1,294 gravesites fit on one acre, 39,548 gravesites could be developed on the 30.563 acres of unimproved land, and the purchase price equaled $ 4.64 per finished gravesite. Also on December 15, 1983, E & *572 D and Limerick entered into an agreement which provided that Limerick would exchange, upon request, finished gravesites with E & D for unimproved land for a fee of $ 15 per gravesite. Further, on this date, E & D acquired a 7.9-percent limited partnership interest in FGV by contributing the unimproved land that it had acquired from Limerick. The Finished Gravesite Exchange and Contribution Program
E & D offered 25 limited partnership units at $ 10,000 per unit to potential investors, many of whom were clients of Elgart, Dickler and Company. Upon subscription, $ 4,000 was paid, and three payments of $ 2,000, plus 10-percent interest per year, were due on November 1 of 1984, 1985, and 1986. In exchange for its contribution of unimproved land acquired from Limerick, E & D was credited with a $ 187,000 capital interest in FGV. This capital interest gave E & D the right to exchange unimproved land for 25,200 finished gravesites in Limerick and 6,720 finished gravesites in Forest Green Park Cemetery, while FGV had the right to exchange unimproved land for 14,348 finished gravesites in Limerick. For 1983, an investor in E & D, through E & D, was entitled to withdraw unimproved land from *573 FGV and exchange it for finished gravesites in Forest Green Park Cemetery, and for 1984, an investor in E & D, through E & D, was entitled to withdraw unimproved land from FGV and exchange it for finished gravesites in Limerick. Mr. Pino was to, and did, execute the exchanges on behalf of Limerick. A partner was required to pay a fee of $ 35 per gravesite, $ 15 of which went to Limerick and $ 20 of which went to FGV, if the partner participated in the exchange program. In addition, if a partner participated in the 1984 exchange program, he was required to pay a tax consulting fee of $ 3,000 to Elgart, Dickler and Company. The present consolidated case only involves the finished gravesites in Limerick. Similar to the FGV exchange and contribution program, an E & D partner was permitted to withdraw unimproved land from FGV, through E & D, in proportion to his capital account ratio, and his capital account was adjusted accordingly. The unimproved land could be held by the partner or exchanged with FGV, through E & D, for finished gravesites in Limerick. The partner reported a capital gain on this exchange, representing the sales price per finished gravesite (less an 18-percent discount) *574 multiplied by the number of finished gravesites received less his basis, which was equal to the partnership's basis for the equivalent amount of land previously withdrawn. The discount was based upon the Forest Green settlement. Mr. Elgart requested Mr. Pino to contact various churches and charitable organizations in the area to see if they were interested in receiving finished gravesites. Mr. Pino informed Mr. Elgart, who was acting for E & D, of the charities who wished to become donees, and Mr. Elgart then informed the partners of E & D of those charities. The partners could hold the finished gravesites if they desired or donate their finished gravesites to a charity of their choice or one of the charities that had notified Mr. Elgart of their interest in receiving such contributions. In all cases, the partners donated their gravesites to the charities recommended by Mr. Elgart. As part of its agreement with FGV and E & D, Limerick deeded the finished gravesites directly to the charities selected by the partners of E & D. As of September 13, 1989, of the 3,240 Limerick gravesites donated to various charities in 1984 by the 15 partners in E & D, 468 were held by individual members *575 of the charities. On their 1984 individual tax returns, the partners claimed charitable deductions in an amount equal to the cemetery's sales price ($ 495) multiplied by the number of finished gravesites received in the exchange for unimproved land less an 18-percent discount based upon the Forest Green settlement (or $ 405.90 per gravesite) and a confirming appraisal report, dated November 15, 1984, by petitioners' expert, Robert Hendricks. In addition, the partners claimed a miscellaneous deduction for the tax consultation fees paid to Elgart, Dickler and Company. Neither William nor Leabelle Waite was a partner in E & D in 1983. William Waite was a client of Mr. Elgart in 1983. In 1982, Mr. Elgart arranged for Mr. Waite to make a bulk purchase of 50 finished gravesites directly from the Limerick cemetery for $ 4,250 and, during 1983, [3] *576 he donated the 50 finished gravesites to the Royersford Baptist Church. The Waites claimed a charitable contribution for the gravesites based upon the undiscounted retail value of $ 495 per gravesite and a deduction for a tax consultation fee paid to Elgart, Dickler and Company. Pennsylvania law prohibits speculation in gravesites, and an individual must be licensed to sell them; none of the petitioners was licensed to sell gravesites in Pennsylvania. In the statutory notices of deficiency, respondent disallowed the following claimed charitable contributions for donated finished gravesites and consulting fees: [4]
No. of
Charitable
Consulting
Petitioners
Gravesites
Deduction
Fees
Weintrob
100
$  40,590
$  3,000
Bernstein
100
40,590
3,000
Kasper
325
131,918
3,000
Wagner
325
131,918
4,000
Martino
450
182,655
15,000
Weiss/Karan
325
131,918
3,000
Fitzgerald
100
40,590
3,000
Forman
325
131,918
3,000
Rhode
340
138,006
8,000
Wilson
325
131,918
3,000
Koch
100
40,590
3,000
Ginsburg
200
81,180
6,000
Blatt
50
20,295
1,500
Waite
50
24,750
1,000
Dickler
175
71,033
--
Elgart
20
8,118
--
ULTIMATE FINDINGS OF FACT Petitioners, other than the Waites, contributed in 1984, and the Waites in 1983, finished gravesites to charitable donees which had a fair market value of $ 85 per gravesite at the time *577 of their respective donations. OPINION The first issue for decision is whether petitioners are entitled to any charitable deduction for the finished gravesites donated to qualified charitable organizations. Respondent contests the allowance of any deduction on several grounds, i.e., that petitioners did not have legal title at the time of the contribution, that the transactions underlying their investment in E & D lacked substance, and that petitioners' dealings in gravesites were violative of State prohibition against speculation in gravesites and therefore against public policy. Initially, respondent asserts that 15 petitioners did not have legal title to the gravesites at the time of their donations [5] because, as investors in E & D, they never received deeds for the unimproved land withdrawn from FGV, through E & D, and for the finished gravesites which they received in the exchange and which were the subject of the claimed contributions. We reject respondent's assertion. Concededly, in order to be entitled to the claimed charitable contributions, petitioners must have been the owners of the finished gravesites. In the instant case, it is clear that, from the outset, all of the *578 parties in interest intended that the finished gravesites would be donated by petitioners to charities selected by Mr. Elgart and/or Mr. Pino, and this is precisely what happened. Letters written by Mr. Pino, enclosing deeds from Limerick to the charity, confirm that Mr. Pino and Limerick recognized petitioners as the owners of the donated lots. Jacobs v. Union Cemetery Association, 1 Pa. Super. 156 (1896), upon which respondent relies, does not stand for the proposition that the absence of deeds of the unimproved land from FGV to petitioners or of the finished gravesites for which the unimproved land was exchanged fatally flaws the transaction. Jacobs merely stands for the proposition that the transfer of a cemetery lot which is not recorded on the books of a cemetery association, as required by its bylaws, is invalid as against a subsequent bona fide purchaser. Here, Limerick, by executing the deeds, was directly involved in the transfer to the charities -- actions which could not fail to have been reflected on its books and records and thus known to any subsequent transferee. Under the circumstances herein, the absence of formal deeds of the unimproved land and the finished *579 gravesites is not significant. See Skripak v. Commissioner, 84 T.C. 285, 317-318 (1985). [6] We hold that petitioners were the owners of the donated finished gravesites.
Respondent next asserts that the claimed contributions were without substance and were shams, citing Gregory v. Helvering, 293 U.S. 465 (1935), and Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). He argues that the ultimate and only purpose of the series of transactions was to obtain tax benefits for the investors. In Skripak v. Commissioner, supra, we rejected a similar challenge by respondent to a charitable contribution through which the taxpayers purchased and donated scholarly reprinted books. [7] We stated, "the deduction for charitable contributions was intended to provide a tax incentive for taxpayers to support charities. Consequently, a taxpayer's desire to avoid or eliminate taxes by contributing cash or property to charities cannot be used as a basis *580 for disallowing the deduction for that charitable contribution." 84 T.C. at 319. In the present case, petitioners parted with their own funds as the result of which the various qualified charitable organizations received finished gravesites. Such being the case, petitioners made substantive donations for which they are entitled to deductions. Compare Allen v. Commissioner, 92 T.C. 1 (1989), where we held that a charitable deduction was available to the extent of the taxpayer's own funds but disallowed a deduction to the extent of funds borrowed from the charity and returned to it. Respondent next alleges that allowance of the charitable contributions would violate the Pennsylvania law against speculation in gravesites and therefore public policy. The parties have stipulated that Pennsylvania law prohibits speculation in gravesites and an individual must be licensed to sell them and that none of the petitioners was licensed to sell gravesites in Pennsylvania. Since petitioners did not offer their lots for sale to others but simply disposed of their gravesites as part of an exchange and *581 contribution program, it is clear that they were not required to be licensed. Nor did petitioners' participation in the exchange and contribution program amount to speculation since the finished gravesites were at all times intended to be, and were in fact, donated to charities. We therefore fail to see how the donation of finished cemetery lots to qualified charitable organizations, and the resulting charitable deduction, would violate public policy, much less a public policy so sharply defined as to warrant a denial of a charitable deduction. See Sammons v. Commissioner, 838 F.2d 330, 336-337 (9th Cir. 1988), affg. on this issue a Memorandum Opinion of this Court. We now turn to a consideration of the amount of the charitable deductions to which petitioners are entitled. That amount is the fair market value of the finished gravesites at the time of the contributions. Fair market value is defined as: the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. If the contribution is made in property of a type which the taxpayer sells in *582 the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed. The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, but if he sells only at retail the usual market consists of his retail customers. [Sec. 1.170A-1(c)(2), Income Tax Regs.] Fair market value is a question of fact to be determined from the entire record. Skripak v. Commissioner, 84 T.C. at 320. The burden of proof is on petitioners. Rule 142(a); Symington v. Commissioner, 87 T.C. 892, 896 (1986). Petitioners contend that the fair market value of each finished gravesite is $ 405. Basically, petitioners' expert used the "primary market," i.e., sales by the cemetery to individuals, and a 10-year "absorption period," i.e., his estimate of the holding period of the gravesites prior to disposition. On this basis, he determined that the fair market value should be the retail value *583 of $ 495 for an individual gravesite, [8] less an 18-percent discount for illiquidity. Petitioners' valuation does not take into account expenses and does not discount the retail price for a bulk transfer. Respondent, on the other hand, values the donations at $ 7 per gravesite. Respondent's expert used the "developer's approach" method of valuation, applied a 228-year period of absorption, and based his determination upon sales in the "secondary market," i.e., sales other than by the cemetery. We find neither expert determination persuasive and therefore proceed to make our own determination. See Parker v. Commissioner, 86 T.C. 547, 561-562 (1986). Although retail price is one factor to be considered in determining the value of the gravesites, use of the retail price method alone is not justified. See Montrose Cemetery Co. v. Commissioner, 105 F.2d 238, 244 (7th Cir. 1939), affd. 309 U.S. 622 (1940), affg. a Memorandum Opinion of this Court. Petitioners' expert has relied too heavily on the retail price without: (1) reducing the price to account for sales of multiple gravesites, cf. Goldstein v. Commissioners,89 T.C. 535 (1987); *584 [9] (2) taking into account the expenses to be incurred by the ultimate user; and (3) giving adequate consideration to the restrictions on the ability of petitioners to sell the gravesites. Nor are we persuaded that the 18-percent discount applied to the retail price by petitioners should be accepted as reflecting these elements since that discount appears to have been adopted automatically based upon a settlement by respondent involving other taxpayers and another cemetery, a clearly inappropriate element of valuation. On the other hand, respondent's valuation is flawed in that it inflexibly applies a 228-year period of absorption. See Montrose Cemetery Co. v. Commissioner, supra.See also Estate of Smith v. Commissioner, 57 T.C. 650, 657-658 (1972), affd. on another issue 510 F.2d 479 (2d Cir. 1975). Under similar circumstances in Broad v. Commissioner, T.C. Memo. 1986-340, involving the valuation of multiple gravesites in Pennsylvania which were donated to charitable organizations, we rejected the experts' valuations and found the fair market value of the gravesites to *585 be equal to the taxpayers' cost. See Goldstein v. Commissioner, 89 T.C. at 547; Lio v. Commissioner,85 T.C. 56, 71 (1985), affd. sub nom. Orth v. Commissioner, 813 F.2d 837 (7th Cir. 1987); Chiu v. Commissioner, 84 T.C. 722, 734-736 (1985). [10] See also Skripak v. Commissioner, supra at 327. Further, in Cooley v. Commissioner, 33 T.C. 223 (1959), affd. 283 F.2d 945 (2d Cir. 1960), we upheld respondent's use of cost to determine the value of a charitable contribution of automobiles where there was a restriction as to the marketability. We stated, "Plainly, these automobiles, were not marketable in petitioner's hands, and it would be completely unrealistic to permit him a deduction based on the 1952 retail value of marketable models." 33 T.C. at 225. Similarly, it would be unrealistic to permit petitioners a deduction based upon the retail value when they had no intention of selling the gravesites and could not do so without a license. We conclude that, under the circumstances herein, petitioners *586 have not carried their burden of proof that the fair market value of the finished gravesites is in excess of their cost. It appears that petitioners, other than the Waites, used a $ 41 cost basis for each gravesite in computing their capital gain which they reported on the exchange in 1984 of the unimproved land for finished gravesites. This amount, which respondent accepts on brief as their cost, apparently represents $ 6 per gravesite as the amount paid to Limerick by E & D [11] in 1983 for the unimproved land which was later exchanged for the improved gravesites, plus $ 15 paid to Limerick and $ 20 paid to FGV. See supra pp. 9-10. However, in 1982, the Waites purchased 50 gravesites from Limerick at $ 85 per gravesite, a figure which respondent accepts as the Waites' cost. [12] While there is some testimony that both prices may have been low because of Limerick's alleged eagerness to obtain funds, the gap between the costs and the value utilized by petitioners on their tax returns is simply too large for us to accept such an explanation as credible support for the value figure. We have considered the possibility of sustaining each petitioner's deduction to the extent of their differing *587 costs, which would produce a $ 41 figure for petitioners other than the Waites and the $ 85 figure for the Waites. See Lio v. Commissioner, 85 T.C. at 71, where we arrived at a different amount of charitable deduction for each taxpayer based upon differing costs. However, in Lio, both taxpayers purchased and donated lithographs; whereas, in the instant case, petitioners (other than the Waites) first purchased, through E & D, unimproved acreage which they later exchanged for the donated finished gravesites, while the Waites purchased the finished gravesites directly. Indeed, this element may account for the differing costs. While there is some evidence of a relatively small increase in the retail price of a gravesite ($ 445 to $ 495) between the time of the Waites' purchase (1982) and the time of the purchases by the other petitioners (1983), there is no evidence of any further change in price between 1983 when the Waite donation was made and 1984 when the donations of the other petitioners were made. On balance, we think that the price the Waites paid seems to be more indicative of the fair market value of the donated property. We hold that the Waites are entitled to a charitable *588 deduction of $ 85 per gravesite for their 1983 contribution and each of the other petitioners is entitled to a charitable deduction for 1984 in the same amount. Petitioners also claim that, if we redetermine the value of the finished gravesites for purposes of their charitable deductions, they are entitled to have the same value used for determining the reported capital gain and that they are entitled to any resulting overpayment. As respondent does not challenge this position, this adjustment will be reflected in the Rule 155 computations. We next address petitioners' argument that the exchange of unimproved land for improved gravesites qualifies as a tax-free exchange. Under section 1031, no gain or loss is recognized if property held for productive use in the taxpayer's trade or business or for investment is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. Petitioners have failed to demonstrate that the unimproved *589 land and the finished gravesites were held by them for use in their trade or business or for investment. To the contrary, as the parties have stipulated, petitioners were prohibited from selling the gravesites without a license. Moreover, it is clear that petitioners acquired the gravesites for the express purpose of making donations to tax-exempt entities. We therefore hold that the exchange was not a tax-free exchange within the meaning of section 1031. We now address the deductibility of the consulting fees under section 212(3). Section 212(3) allows a deduction for amounts paid in connection with the determination, collection, or refund of any tax, and generally, ordinary and necessary expenses paid for Federal income tax planning are deductible. See Zmuda v. Commissioner, 79 T.C. 714, 725 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Petitioners bear the burden of proof as to their entitlement to the claimed deductions. Rule 142(a). Some of the notices of deficiencies disallow the deductions for consulting fees on the ground that petitioners failed to establish entitlement to the claimed deductions, while other notices assert that the fees were paid in connection with acquiring *590 a partnership interest.[13] The hard fact of the matter is that while there is some evidence that Elgart, Dickler and Company rendered some tax advice which might otherwise be an allowable deduction under section 212, it is clear that the services rendered to petitioners by Elgart, Dickler and Company, in connection with the transactions involved herein, included much more than the rendition of tax advice. Petitioners have failed to carry their burden of proof as to what portion of the payments to Elgart, Dickler and Company can be allocated to tax advice. See Benson v. Commissioner, 80 T.C. 789, 803-804 (1983). Cf. Merians v. Commissioner, 60 T.C. 187 (1973). See also Surloff v. Comissioner,81 T.C. 210, 244-246 (1983). In Carpenter v. United States, 168 Ct. Cl. 7, 338 F.2d 366 (1964), relied upon by petitioners, there was sufficient evidence upon which such an allocation could be based. See 338 F.2d at 367. We next turn to the additions to tax and increased interest under sections 6653(a), 6659, 6661, and 6621(c). Section 6653(a)(1) imposes an addition *591 to tax if any part of any underpayment is due to negligence or intentional disregard of rules or regulations, and section 6653(a)(2) imposes a further addition to tax with respect to the portion of such underpayment which is due to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances, and the burden of proof is on petitioners. Birth v. Commissioner, 92 T.C. 769, 770 (1989). Petitioners' claimed charitable deductions were based upon: (1) the advice of their accountants, (2) a settlement with respondent in respect of the value of gravesites in a comparable cemetery at a time reasonably proximate to the times involved herein, and (3) an appraisal report which was available prior to the filing of their tax returns. Of critical importance is the fact that petitioners, other than the Waites, on the basis of the prior settlement with respondent (see supra p. 7), reduced the appraisal value of each gravesite ($ 495) to the settlement price ($ 405.90). This element, when added to the other two elements noted above, tips the scales in favor of those petitioners and enables us to conclude that they *592 have carried their burden of proof as to negligence in respect of the excessive deductions of their charitable contributions and to avoid any potential inconsistency between this conclusion and our subsequent conclusion (see infra pp. 27-29) that those petitioners are liable for the addition to tax under section 6661. [14] We reach a different conclusion as to the negligence of the Waites. They used a $ 495 value based upon Cemetery's selling price and gave no effect to the settlement with respondent, although it appears that they must have been aware of the settlement through Mr. Elgart at the time they filed their 1983 return. [15] Under these circumstances, we are unable to conclude that the Waites have carried their burden of proof in respect of the excessive deduction of their charitable contributions. As far as the portion of underpayment attributable to the deduction of the consulting fees is concerned, petitioners have failed to carry their *593 burden of proof. The private placement memorandum expressly stated in connection with the deduction of the consulting fees: To the extent such services may be deemed to be expenses incurred in acquiring an interest in the Partnership, such expenses are non-deductible. Each investor should consult with his personal tax advisor to determine whether the above described fees, depending upon the nature and extent of services to each Partner, are deductible on the Partner's personal tax return. Only two petitioners testified in respect of the fees, and neither gave sufficient evidence of reliance on professional advice to support the claimed deductions. We hold that each petitioner is liable: (1) under section 6653(a)(1), for the addition to tax on the entire underpayment and (2) under section 6653(a)(2), on that portion of the underpayment attributable to the deduction of consulting fees. We further hold that the Waites are liable, under section 6653(a)(2), on that portion of the underpayment attributable to the excessive deductions of their charitable contributions. Respondent also determined an addition to tax in the case of the Waites for a valuation overstatement under section 6659. *594 [16] Section 6659(c) provides that a valuation overstatement occurs where the claimed value of property, or its adjusted basis, is 150 percent or more of amount determined to be correct. In the case of any underpayment attributable to a valuation overstatement with respect to charitable deduction property, the applicable percentage for the addition to tax is 30 percent of the underpayment so attributable. Sec. 6659(f)(1). As the Waites claimed a value of $ 495 for each gravesite, and since we have determined that the value of the gravesites is $ 85, we sustain respondent's imposition of this addition to tax. Respondent also determined an addition to tax against all petitioners, other than the Waites, [17] for a substantial understatement of income tax under section 6661. Section 6661(b)(2)(B) and (C) provides special rules for tax shelters.[18] *597 It cannot be gainsaid that the principal purpose of petitioners' participation in the exchange and contribution program was to avoid tax by means of a charitable deduction. Consequently, petitioners were involved in a tax shelter program within the meaning of *595 section 6661(b)(2)(C)(ii). Cf. Skripak v. Commissioner, supra.The fact that the program had substance and was not required to have a profit objective does not necessitate a different conclusion. Cf. Allen v. Commissioner, 92 T.C. 1 (1989). To conclude otherwise would negate the application of section 6661 to any substantial understatement of income tax resulting from an overstatement of an otherwise valid deduction in the situation where the principal purpose of the transaction was the avoidance or evasion of Federal income tax. Thus, the adequate disclosure exception of section 6661(b)(2)(B)(ii) does not apply, [19] and petitioners are liable for this addition to tax unless the treatment of the charitable deduction was supported by substantial authority and they reasonably believed that the tax treatment of such item was more likely than not the proper treatment. See Horn v. Commissioner, 90 T.C. 908, 943 (1988). The confidential private placement memorandum supplied by E & D to petitioners devotes three pages to a discussion of the "tax risks," including the imposition of the addition to tax under section 6661, and indicates the likelihood of an attack by respondent. Under these *596 circumstances, we are unable to conclude that petitioners could reasonably have believed that the claimed charitable contribution was more likely than not the proper treatment. See McCrary v. Commissioner, 92 T.C. 827, 856-857 (1989). The factual elements which underpin our conclusion that petitioners have carried their burden of proof that they were not negligent in respect of the amount of the charitable deductions under section 6653(a)(1) and (2) is not the equivalent of substantial authority. Cf. Antonides v. Commissioner, 91 T.C. 686, 700-704 (1988), affd. 893 F.2d 656 (4th Cir. 1990). We sustain respondent's imposition of this addition to tax to the extent that there is a substantial understatement reflected in the Rule 155 computations. Finally, we address the *598 imposition of additional interest under section 6621(c), which imposes interest at the rate of 120 percent of the normal rate for any substantial underpayment attributable to "tax motivated transactions." A "tax motivated transaction" includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Since we have determined that the value of each gravesite is $ 85, and since petitioners claimed a deduction far in excess of that amount, we hold that there is a valuation overstatement within the meaning of section 6659(c). Therefore, respondent's determination in respect of increased interest under section 6621(c) is sustained to the extent that the Rule 155 computations reflect a substantial underpayment. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Edward Bernstein and Jennie Bernstein, docket No. 17283-88; Herbert Kasper and Sandra Kasper, docket No. 18401-88; John T. Wagner and Delores K. Wagner, docket No. 18421-88; Anthony A. Martino and Karen M. Martino, docket No. 18422-88; Stephan Weiss and Donna Karan, docket No. 18423-88; Russell E. Fitzgerald and Frances L. Fitzgerald, docket No. 18537-88; Gary Forman and Marsha Forman, docket No. 18710-88; Daniel Rhode and Sally Rhode, docket No. 18711-88; Edgar B. Wilson and Mary B. Wilson, docket No. 18712-88; William C. Koch and Susan H. Koch, docket No. 18714-88; Bruce M. Ginsburg and Lisa R. Ginsburg, docket No. 18774-88; Mark A. Blatt and Rita J. Blatt, docket No. 18775-88; William N. Waite and Leabelle M. Waite, docket No. 21063-88; Arthur Dickler and Ethel Dickler, docket No. 31044-88; Ellis L. Elgart and Sivia V. Elgart, docket No. 8540-89.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of interest due on the portion of the underpayment attributable to negligence.↩
3. Paragraph 340 of the stipulation of facts states that the contribution was in 1982, but it is obvious from other stipulated material that it was made in 1983.
4. With respect to petitioners Bernstein, respondent disallowed only $ 36,490 of the charitable deduction (a basis of $ 4,100 was allowed as a charitable deduction).↩
5. Respondent does not contend that the Waites did not have legal title to the gravesites which they purchased directly from Limerick.↩
6. See also Weitz v. Commissioner, T.C. Memo. 1989-99; Sandler v. Commissioner, T.C. Memo. 1986-451↩.
7. See also Weitz v. Commissioner, T.C. Memo. 1989-99; Hunter v. Commissioner, T.C. Memo. 1986-308↩.
8. The $ 495 included a set-aside of 15 percent for perpetual care.↩
9. Cf. also Sandler v. Commissioner, T.C. Memo. 1986-451. See also Jennings v. Commissioner, T.C. Memo. 1988-521↩.
10. See also Schachter v. Commissioner,T.C. Memo. 1986-292; Lampe v. Commissioner, T.C. Memo. 1985-236; Theodotou v. Commissioner, T.C. Memo. 1985-181; Talebi v. Commissioner, T.C. Memo. 1985-180↩.
11. The discrepancy between this figure and the $ 4.64 stipulated by the parties, see supra↩ p. 8, is not explained.
12. Neither the $ 41 price nor the $ 85 price included any amount for perpetual care.↩
13. The notices of deficiency issued to the Elgarts and the Dicklers contained no disallowance since they claimed no such deduction.↩
14. Cf. Weitz v. Commissioner, T.C. Memo. 1989-99; Avers v. Commissioner, T.C. Memo. 1988-176. See also Broad v. Commissioner, T.C. Memo. 1986-340↩.
15. The Hendricks' 1984 appraisal had not been made at the time the Waites filed their 1983 return.↩
16. Respondent made no such determination in respect of any of the other petitioners.↩
17. Presumably respondent did not make a determination against the Waites under sec. 6661 because of his determination that they were liable under sec. 6659. See sec. 6661(b)(3).↩
18. Sec. 6661(b)(2)(B) and (C) provides in pertinent part: (B) Reduction for understatement due to position of taxpayer or disclosed item. -- The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to -- (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. (C) Special rules in cases involving tax shelters. -- (i) In general. -- In the case of any item attributable to a tax shelter -- (I) subparagraph (B)(ii) shall not apply, and (II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. (ii) Tax shelter. -- For purposes of clause (i), the term "tax shelter" means -- (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.↩
19. In so stating, we do not mean to imply that petitioners made adequate disclosure on their returns within the meaning of the statutory provision.↩